

U.S. Department of Justice

United States Attorney
Eastern District of New York

CCC/AT/AXB
F. #2022R00047

610 Federal Plaza
Central Islip, New York 11722

July 25, 2023

<u>By Hand and ECF</u>

The Honorable James M. Wicks
United States Magistrate Judge
Eastern District of New York
100 Federal Plaza
Central Islip, New York 11722

   Re: United States v. Adam Kaplan and Daniel Kaplan
     <u>Criminal Docket No. 23-293 (GRB)</u>

Dear Judge Wicks:

   This afternoon the defendants Adam Kaplan and Daniel Kaplan are scheduled for arraignment before Your Honor on the above-referenced indictment charging them with conspiracy to commit wire fraud, wire fraud, investment advisor fraud, and money laundering in connection with a scheme to defraud at least 50 victims of more than $5 million. For the reasons set forth below, we respectfully submit that, short of a permanent detention order, the defendants present a sufficient risk of nonappearance and continued criminality to justify stringent conditions of release, including a fully secured $5 Million bond—representing the minimum amount of unaccounted for victim funds—co-signed by multiple financially responsible sureties.

FACTUAL BACKGROUND[1]

   Between May 2018 and November 2022, the defendants defrauded at least 50 clients (the "Victims"), including some elderly and disabled victims, of at least $5 million. Many of the defendants' clients were family friends, neighbors, and members of the defendants' community, and because of those relationships, the clients trusted the defendants to use their accounts without much oversight. The defendants are twin brothers and were associated as investment adviser representatives with a Financial Services Firm, an entity the identity of which

---

[1] The proffer of facts set forth herein does not purport to provide a complete statement of all facts and evidence of which the government is aware or that it will seek to introduce at trial. The government is entitled to proceed by proffer in a detention hearing. <u>United States v. Abuhamra</u>, 389 F.3d 309, 320 n.7 (2d Cir. 2004); <u>United States v. LaFontaine</u>, 210 F.3d 125, 130–31 (2d Cir. 2000); <u>United States v. Martir</u>, 782 F.2d 1141, 1145 (2d Cir. 1986).

is known to the government, from in or about and between May 2018 and July 2021. Generally, the defendants each made investment-related recommendations to their clients; had discretion, including trading authority, over their clients' accounts; ordered trades; and managed their clients' investment portfolios. After leaving the Financial Services Firm, the defendants continued to act as investment advisers to their clients

The defendants defrauded the Victims in a number of ways. First, while they were associated with the Financial Services Firm, they caused the Victims to be fraudulently overbilled for advisory fees. Second, they used access to the Victims' personal information to misappropriate over $4 million from the Victims for their personal benefit. Finally, they created false documents and made material misrepresentations to the Victims and financial institutions to conceal their misappropriation of the Victims' funds.

With respect to the first scheme (the "Overbilling of Advisory Fees Scheme"), while the defendants were associated with the Financial Services Firm, they caused many of the Victims to be fraudulently overbilled for advisory fees. During that time, the Financial Services Firm charged the Victims an advisory fee that was based on a percentage of the Victims' assets under management. The amount of the fee was set forth in a written agreement between the client and the Financial Services Firm (the "Advisory Agreement"). As the Victims' investment advisers, the defendants received at least 80% of those advisory fees. The defendants submitted signed, final versions of the Advisory Agreements to the Financial Services Firm. Generally, the fee was billed to the Victims by the Financial Services Firm on a quarterly basis and was taken directly from the Victims' brokerage accounts.

In order to perpetrate their fraudulent scheme, the defendants orally agreed with Victims to charge a certain advisory fee, typically 1% or less per year. The defendants then fraudulently caused the Victims to pay higher advisory fees by having the Victims sign Advisory Agreements with the fee amount section left blank. After the Victims signed the Advisory Agreements, the defendants inserted advisory fees that were higher than what they orally promised to charge the Victims, typically over 2%. This caused the Financial Services Firm to charge the Victims higher, fraudulently inflated advisory fees. In total, the defendants caused the Victims to be overbilled by more than $540,000, of which the defendants received at least 80%.

With respect to the second scheme (the "Misappropriation Scheme"), the defendants misappropriated millions of dollars from the Victims through various fraudulent means, including through electronic charges that they fraudulently applied to the Victims' credit cards and bank accounts. The defendants also forged checks from the Victims' accounts and deposited them into their own bank accounts. Purportedly in connection with providing the Victims with investment adviser services, the defendants requested, and many of the Victims provided, the defendants with the Victims' brokerage accounts, personal bank accounts, and/or their personal credit card information. Although the defendants informed the Victims that their funds would be invested, the defendants instead misappropriated the Victims' personal information to fraudulently obtain over $4 million of the Victims' funds. The defendants then used the funds to, among other things, pay personal expenses and purchase goods, including from a luxury goods boutique.

If Victims inquired about the fraudulent charges, the defendants falsely told some Victims that the fraudulent charges were for advisory fees purportedly owed by Victims. These representations were false because, as the defendants knew, the Victims did not owe any additional fees, as the Financial Services Firm had already charged the Victims for those fees.

The defendants also falsely told some Victims that the fraudulent charges represented investments even though the defendants knew that they were misappropriating the Victims' funds for their own benefit and were not in fact investing the misappropriated funds for the Victims. In total, the defendants misappropriated at least $4 million.

Finally, to conceal and continue their fraudulent scheme, the defendants made Ponzi-style payments to certain clients, created fraudulent and forged documents, including signatures on checks and fraudulent agreements. For example, in some instances, Victims contacted the fraud departments of their financial institutions to challenge fraudulent transactions instituted by the defendants. On these occasions, the defendants created, without the knowledge of the Victims, fictitious agreements with the Victims that purportedly authorized the defendants to charge the Victims' accounts for the specific charges that the Victims challenged in their fraud claim. The defendants also forged the Victims' signatures on these agreements without the Victims' authorization. The defendants then sent those fictitious agreements to the financial institutions so that the financial institutions would deny the Victims' fraud claims. Due to the fictitious documentation provided by the defendants, the financial institutions denied the Victims' fraud claims.

The defendants also made payments to the Victims to conceal their fraudulent activities. In some instances, when Victims complained regarding missing funds that the defendants had misappropriated, the defendants paid the Victims back using funds that were misappropriated from other Victims.

For this conduct, on July 18, 2023, a grand jury sitting in this district returned a sixteen-count Indictment charging the defendants with (i) conspiracy to commit wire fraud, in violation of Title 18, United States Code, Section 1349; (ii) wire fraud, in violation of Title 18, United States Code, Section 1343; (iii) investment adviser fraud, in violation of Title 15, United States Code, Section 80b-6; and (iv) money laundering, in violation of Title 18, United States Code, Section 1957(a). The defendants were taken into federal custody earlier today.

ARGUMENT

I.  The Bail Reform Act

Under the Bail Reform Act, 18 U.S.C. § 3141 et seq., federal courts are empowered to order a defendant's detention pending trial upon a determination that the defendant is either a danger to the community or a risk of flight and that no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person and the community. See 18 U.S.C. § 3142(e). A finding of dangerousness must be supported by clear and convincing evidence. United States v. Ferranti, 66 F.3d 540, 542 (2d Cir. 1995); United States v. Chimurenga, 760 F.2d 400, 405 (2d Cir. 1985). A finding of risk of flight or obstruction of

justice must be supported by a preponderance of the evidence. United States v. Jackson, 823 F.2d 4, 5 (2d Cir. 1987); United States v. Madoff, 586 F. Supp. 2d 240, 247 (S.D.N.Y. 2009).

Short of detention, the Court must impose such additional conditions as will reasonably assure the defendant's appearance as required and the safety of any other person and the community. See 18 U.S.C. § 3142(c)(1)(B). This may include executing "an agreement to forfeit upon failing to appear as required, property of a sufficient unencumbered value." Id. § 3142(c)(1)(B)(xi). In determining which conditions of release will reasonably assure the defendant's appearance, the Court must consider, among other things: (i) the nature and circumstances of the offenses charged; (ii) the weight of the government's evidence; (iii) the defendant's history and characteristics; and (iv) the nature and seriousness of the danger to any person or the community that would be posed by the defendant's release. See id. § 3142(g).

II.  The Defendants Pose a Danger to the Community and Risk of Flight

A.  The Defendants Each Present a Risk of Flight

The defendants constitute a flight risk due to the seriousness of the offense, the strength of the evidence and the severity of the penalties that they face.

First, the nature and circumstances of the offenses charged weigh heavily against the defendants. The seriousness of the offenses is self-evident: the defendants engaged in a sophisticated scheme to defraud at least 50 victims of more than $5 million. And they took concerted steps to conceal their scheme, including creating fictitious and forged documents.

Second, the weight of the evidence against the defendants is overwhelming. At trial, the government will introduce testimony from the victims, fraudulent and forged documents that the defendants created, text messages and other correspondence, including e-mails, bank records and other documentary evidence, establishing the defendants' guilt. Where, as here, the evidence of guilt is strong, it provides "a considerable additional incentive to flee." United States v. Millan, 4 F.3d 1038, 1046 (2d Cir. 1993); see also United States v. Palmer-Contreras, 835 F.2d 15, 18 (1st Cir. 1987) (per curiam) (where "the evidence against defendants is strong, the incentive for relocation is increased").

Third, the defendants have the means and international connections to flee. Records obtained by the government reflect the defendants' prior travel to, among other places, Canada, Mexico, and France. Moreover, the defendants have misappropriated at least $5 million, all of which is unaccounted for. See United States v. Zarrab, No. 15-CR-867 (RMB), 2016 WL 3681423, at *8 (S.D.N.Y. June 16, 2016) (citing defendant's "significant wealth and his substantial resources" as another factor that supported detention).

Finally, the significant term of imprisonment that the defendants face creates a substantial incentive to flee. The possibility of a severe sentence is an important factor in assessing a defendants' likelihood of flight. See United States v. Jackson, 823 F.2d 4, 7 (2d Cir. 1987); United States v. Martir, 782 F.2d 1141, 1147 (2d Cir. 1986) (defendants charged with serious offenses whose maximum combined terms created potent incentives to flee); United States v. Cisneros, 328 F.3d 610, 618 (10th Cir. 2003) (defendant was a flight risk because her knowledge

of the seriousness of the charges against her gave her a strong incentive to abscond); United States v. Townsend, 897 F.2d 989, 995 (9th Cir. 1990) ("Facing the much graver penalties possible under the present indictment, the defendants have an even greater incentive to consider flight,"); United States v. Dodge, 846 F. Supp. 181, 184 85 (D. Conn. 1994) (possibility of a "severe sentence" heightens the risk of flight).  Here, if convicted, the government estimates that the defendants' advisory sentencing range under the United States Sentencing Guidelines to be 135 to 168 months.  Accordingly, the defendants have a tremendous incentive to flee.

In sum, the government has established by a preponderance of evidence that the defendants are a risk of flight for purposes of the Bail Reform Act.

B. The Defendant Pose a Danger to the Community

The defendants are also a danger to the community.  The concept of dangerousness includes "'the danger that the defendant might engage in criminal activity to the detriment of the community.'"  United States v. Millan, 4 F.3d 1038, 1048 (2d Cir. 1993).  Likewise, dangerousness can be established by a showing that the defendant poses a risk of economic harm to the community.  See United States v. Madoff, 586 F. Supp. 2d 240, 253 (S.D.N.Y. 2009) ("[T]here is jurisprudence to support the consideration of economic harm [under the Bail Reform Act] in the context of detention to protect the safety of the community."); United States v. Patel, 2020 WL 1698785, at *3 (D.N.J. Apr. 8, 2020) ("When assessing danger to the community [under the Bail Reform Act], danger may . . . encompass pecuniary or economic harm.").  Here, the defendants engaged in a multi-year sophisticated fraudulent scheme and cover-up.  The defendants continued to engage in the scheme when they were fired from the Financial Services Firm.  They continued to engage in the scheme even though they knew that the Securities and Exchange Commission was investigating them.  And they continued to engage in the scheme after learning that the Federal Bureau of Investigation was investigating them.  That kind of sustained dedication to fraud and deceit amply establishes that the defendants pose a continuing threat to the community in the form of their perpetration of additional fraudulent conduct while at liberty.  Accordingly, the Court should find that the government has also met its burden of proving, by clear and convincing evidence, that the defendants pose a danger to the community.

CONCLUSION

        For the foregoing reasons, the government respectfully requests that, consistent with the Bail Reform Act, the Court impose stringent conditions of release, including a fully secured $5 Million bond co-signed by multiple financially responsible sureties.

Respectfully submitted,

BREON PEACE
United States Attorney

By:       /s/
     Anthony Bagnuola
     Christopher Caffarone
     Adam Toporovsky
     Assistant U.S. Attorneys
     (631) 715-7849

cc:    Defense Counsel (by hand and ECF)
      Clerk of Court (JMW) (by ECF)

6