**U.S. Department of Justice**

*United States Attorney*
*Eastern District of New York*

CMM:AT/PS
F. #2022R00047

*610 Federal Plaza*
*Central Islip, New York 11722*

December 6, 2024

By E-mail and ECF

The Honorable Joan M. Azrack
United States District Court
Eastern District of New York
100 Federal Plaza
Central Islip, New York 11722

Re: United States v. Adam Kaplan
Criminal Docket No. 23-293 (JMA)

Dear Judge Azrack:

The government respectfully submits this letter in opposition to Adam Kaplan's motion for bail (the "Bail Motion"). (Dkt. No. 131). The Bail Motion should be denied. Based on the evidence in the record, the defendant poses serious risks of danger, flight, and obstruction of these proceedings. For these reasons, the Court should deny the defendant a new bail hearing. See 18 U.S.C. § 3142(f). To the extent the Court decides to reopen the bail hearing, however, the defendant's application for bail still must fail under the Bail Reform Act. His motion ignores the significant evidence presented by the government at the prior hearing showing that the defendant is a serious risk of danger, flight, and obstruction. In light of the well-documented danger posed by the defendant, the proposed conditions of release are woefully insufficient to assure the safety of the community and integrity of these proceedings.

## I. Background

### A. The Indictment, Arrest, and Bail Hearing

On July 18, 2023, the defendant Adam Kaplan, along with his brother, was charged in a sixteen-count Indictment with conspiracy to commit wire fraud, wire fraud, investment advisor fraud, and money laundering in connection with a scheme to defraud at least 50 victims of more than $5 million. (See Dkt. No. 1). The defendant was charged with perpetuating several schemes, including fraudulently overbilling advisory fees, misappropriating his victims' funds in several ways, and concealing and continuing his schemes through Ponzi-style payments.

After arrest, Adam Kaplan was released on a $2.5 million dollar bond secured by his parents' home and an apartment in Manhattan. At his arraignment, Adam Kaplan was

warned by Magistrate Judge Wicks that there could be severe consequences, including detention, if he violated the bond:

> THE COURT: Okay. And you understand that the two people that were just on under oath on the witness stand here are people who love and care for you, your parents. And they've now put their financial wellbeing in your hands, okay, because they're putting faith in you that you're going to comply, that you will comply with these conditions and show up to court when you're supposed to, and cooperate with Pretrial Services, and all of the other conditions. **If you violate any of these conditions, any of them, you could have the bond revoked immediately and you could be held in jail pending your trial.** And in addition, your parents will be on the hook for the $5 million. And in addition, there could be additional charges for you, additional from the ones that are in this indictment, for bail jumping. Okay.

July 25, 2023 Transcript of Arraignment before Honorable James M. Wicks, at 29:16-30:4 (emphasis added) (Attached hereto as Exhibit 1). Adam Kaplan was warned specifically that there could be consequences for his parents, and that he could be detained:

> THE COURT: Okay, so it's critically important you comply with this. And if you comply there will [be] no consequences for your parents, all right. Okay, you're also not to commit any, needless to say, new crimes while on bond. If you're found to have done that, it's also grounds for revoking, apart from the conditions that are in the bond. And it's, one of the conditions is that you're not to have any association of contact with any victims or witnesses to the case. **So needless to say, don't threaten to attempt to influence anyone's testimony that you might think could be a witness. Again, that could lead to revocation of the bond and detention**.

Id. at 30:11-22 (emphasis added).

B. The Defendant's Remand

Despite Judge Wicks's warnings, and the obvious potential consequences of not complying with the conditions of his bond, Adam Kaplan repeatedly and flagrantly violated those conditions throughout his time on pretrial release, and so, on September 9, 2024, the government moved to revoke Adam Kaplan's bond. This was because, as outlined in the government's motion to revoke bail (Dkt. No. 104):

> based on the evidence set forth in the Affidavit in Support of the Government's Motion to Revoke Bail by Special Agent John Iannuzzi of the Federal Bureau of Investigation (the "Affidavit"), there is sufficient evidence for this Court to find, following a hearing, that: (a) there is probable cause that the defendant Adam Kaplan committed several crimes in violation of Federal and State law while on release, including conspiracy to commit wire fraud, in violation of Title 18, United States Code, Section 1349, and attempts to bribe a government official, in violation of Title 18, United States Code, Section 201; (b) there is clear and convincing evidence that the defendant Adam Kaplan violated several other conditions of his release, including that (i) the defendant Adam Kaplan not have any contact with

any victims or witnesses; (ii) the defendant Adam Kaplan refrain from employment pertaining to investment advisement; and (iii) that the defendant Adam Kaplan not commit any crimes while on release; and (c) based on the factors set forth in Title 18, United States Code, Section 3142(g), (i) there is no condition or combination of conditions that will assure that the defendant Adam Kaplan will not flee or pose a danger to the safety of any other person or the community; and (ii) the defendant Adam Kaplan is unlikely to abide by any condition or combination of conditions of release.

As explained in detail in the Affidavit, which is incorporated by reference herein, Adam Kaplan, before his arrest, and while he was aware of a Federal Bureau of Investigation ("FBI") and Eastern District of New York ("EDNY") grand jury investigation into his crimes, and after his arrest, while released on a very stringent, multimillion-dollar bond secured by his parents' properties and with his parents acting as suretors, attempted to threaten and injure victims and witnesses and bribe law enforcement officials. And furthermore, Adam Kaplan violated that multimillion-dollar bond by communicating with victims and continuing to defraud other victims.

Highlighted below are just a few instances of Adam Kaplan's illegal conduct, all of which was carried out by Adam Kaplan while he knew that the FBI and EDNY were investigating him, and while he knew that the consequences of his actions would ultimately be arrest and detention:

1. Adam Kaplan ordered an associate (defined as "CC-1" in the Affidavit), to create a fake email from a victim so that Adam Kaplan could use the fake email as evidence at trial and to impeach that victim's credibility (Affidavit ¶¶ 7-13);

2. Adam Kaplan engaged in a months'-long (conducted daily) fraudulent Ponzi scheme to steal money from victims (Affidavit ¶¶ 14-22);

3. Adam Kaplan attempted to tamper with, threaten, and pay off witnesses (Affidavit ¶¶ 23-46), including, telling his associate that a victim needed "to fear" (¶ 24), that a victim should be "peeing blood / missing teeth and another visited / scared" (¶ 27), that a victim should be sent skull and crossbones imagery (¶¶ 36-39), and that his associate should "put [a victim's] phone on fire . . . Seriously, please blow it up" (¶ 40);

4. Adam Kaplan attempted to bribe law enforcement and court personnel (Affidavit ¶¶ 47-59);

5. Adam Kaplan committed credit card fraud (Affidavit ¶¶ 60-62);

Frankly, Adam Kaplan's conduct, both pre-arrest and post-arrest, while released on bond, is too extensive to repeat at any length in this letter. Adam Kaplan used multiple burner phones to avoid detection and monitoring by law enforcement (¶ 6), used aliases (¶ 129), attempted to break into his victims' (and prior lawyers') email accounts (¶¶ 10, 40 fn. 12), used CC-1 as a go-between to hide his own involvement with victims (e.g., ¶ 69), attempted to destroy evidence (¶ 35), paid off victims (e.g., ¶¶ 45-46), attempted to gather intelligence on his prosecutors (¶¶ 51-52), attempted to cover his tracks by talking in code or not using text-based communications (¶ 57 – "I think we shouldn't text about this"); and even stole funds from his own parents using their credit cards, seemingly without their authorization (e.g., ¶ 120).

Given the extensive evidence outlined above and in the Affidavit, on September 11, 2024, Your Honor detained Adam Kaplan, finding that there was clear and convincing evidence that no condition or combination of conditions would reasonably assure the safety of any other person and the community. (See Dkt. No. 110). Your Honor also found that the weight of evidence against the defendant was strong and that the defendant participated in criminal activity while on pretrial supervision. (Id.). The defendant was remanded to the Metropolitan Detention Center ("MDC"), a Bureau of Prisons ("BOP") facility, where he has remained in pretrial custody to the present.

C. The Defendant's Time at the MDC

In the Bail Motion, the defendant does not contest the merits of the Affidavit (see Dkt. No. 131 at 1 fn. 1 –"In this memorandum, we do not contest the merits of the factual allegations set forth in the [Affidavit]"). Nor can he. As the defendant knows, the Affidavit is extensively corroborated by text-based messages, toll records, recorded phone calls, interviews with over a dozen individuals, and bank records. Instead, the defendant premises his entire motion on the conditions at the MDC and [REDACTED]. The defendant has been at the MDC for under three months.

Although the defendant makes several complaints regarding conditions at the MDC and [REDACTED], those complaints are either not corroborated, overstated, or irrelevant to a bail determination. For example, Adam Kaplan complains extensively that he has been "confined to his cell for over 85% of the time," which apparently includes "from 9 p.m. to 8 a.m." (i.e., bedtime) (Bail Motion at 1). This is obviously not a compelling reason to release someone that is a serious danger to others or a flight risk. Even so, this is wrong. According to MDC officials, inmates are recalled at 9:15 p.m. for the 9:30 p.m. count and are locked in starting at 10:00 p.m. They are allowed out of their cells starting at 6:00 a.m. and must be dressed for the standing count at 7:00 a.m. This is bureau-wide policy. In addition, the defendant complains that he has not been "outdoors" for the entire time he has been incarcerated, and the windows to his unit are "blocked by crude obstructions[.]" (Id. at 2). Again, this is not a compelling reason to release the defendant. But even so, each unit has an outdoor recreation deck that allows inmates fresh air and sunlight, and the defendant has not lodged any complaints regarding obstructions in his unit.

The defendant also complains of [redacted]. He claims that he has been [redacted]. To be clear, none of this is corroborated. [redacted]

The government, however, reached out to MDC officials regarding these complaints and others in the Bail Motiom, and received the following response:

Moreover, in recent months, officials at BOP have worked tirelessly to improve conditions for inmates and staff. For example, according to public MDC records, an "Urgent Action Team" has facilitated the following positive changes at MDC, as of September 19, 2024:

> **Significantly increased staffing levels, particularly for Corrections Officers (COs) and medical personnel:** 70% of CO positions are filled compared with 55% in January. About 90% of medical positions are filled compared to 69% in January. Notably, in January, MDC Brooklyn had one nurse on staff. It now employs six nurses on staff.
>
> **Increased pay for employees at MDC, which is critical to maintaining and increasing staffing levels.** The base starting salary for COs in the New York City area is $57,340. FBOP offers a 25% recruitment incentive to all new COs. In spring 2024, MDC Brooklyn was approved by the Office of Personnel Management (OPM) to pay a 35% retention incentive to all employees. This significantly increased CO pay, which has allowed MDC Brooklyn to retain experienced employees.

**New tools to streamline and accelerate CO hiring:** Since January, MDC Brooklyn has received approval to use Direct Hire Authority, a hiring authority that streamlines and accelerates the hiring process for COs. This has allowed us to hire more quickly and was a key tool in raising the staffing levels at MDC Brooklyn.

**Improved the ratio of COs to adults in custody:** FBOP has taken several steps to manage the population at MDC Brooklyn to do more with existing resources. Although we cannot detail these steps for safety and security reasons, they have had a significant impact. In January, MDC Brooklyn had about 1580 adults in custody. Currently, the population is about 1220. Increasing the number of COs and decreasing the number of adults in custody has improved the ratio of COs to adults in custody.

**Initiated the use of telehealth at MDC Brooklyn.** MDC Brooklyn has partnered with a local hospital to begin providing telehealth services for some medical needs. In addition, MDC Brooklyn utilizes telehealth to allow FBOP medical providers to offer certain types of care to adults in custody. In spring 2024, new telehealth equipment was installed in each housing unit. The Urgent Action Team is working with MDC Brooklyn to expand its telehealth program to new specialties. The use of telehealth has a dynamic impact on staffing needs. For example, we are able to provide 9 AICs with specialist consults during a telehealth day. Prior to the use of telehealth, each of these AICs would need to be escorted to an outside medical facility by two employees. With telehealth, each of these appointments frees up approximately 8 hours of custodial staff time.

**Completed significant facilities repairs and improvements.** In spring 2024, over four weeks, two teams deployed to MDC Brooklyn to make a wide range of repairs at the facility. The teams completed over 800 work orders, including electrical and plumbing upgrades and repairs to food service, maintenance to HVAC systems, repair and replacement of broken windows, installation of lighting and security cameras, and upgrades to equipment in control centers. During this period, the facilities teams went cell to cell and resolved all plumbing and most electrical issues that were identified.

**Installed dozens of new computers in housing units to facilitate individual's access to legal documents.** More than 40 new computers were installed to allow adults in custody greater access to review their legal documents.[1]

[1] See https://www.bop.gov/resources/pdfs/mdc_bro_uat_fact_sheet.pdf?v=1.0.0) (Last Visited, December 6, 2024)

II. Argument

A. Applicable Law

Under the Bail Reform Act, the district court has discretion to reopen a bail hearing "if information comes to light that is both new and material to the detention question." United States v. Zhang, 55 F.4th 141, 147 (2d Cir. 2022). Specifically, a bail determination "may be reopened . . . before trial if the judicial officer finds that information exists that was not known to the movant at the time of the hearing and that has a material bearing on the issue whether there are conditions of release that will reasonably assure the appearance of such person as required and the safety of any other person and the community." 18 U.S.C. § 3142(f)(2)(B). However, "[a] bail hearing should not be reopened on the basis of information that was available to the defendant at the time of the hearing." United States v. Lewis, No. 16 Cr. 212 (LAK), 2016 WL 6902198, at *2 (S.D.N.Y. Nov. 16, 2016) (citing United States v. Hare, 873 F.2d 796, 799 (5th Cir. 1989)); see United States v. Mizell, No. 14 Cr. 212 (RJS), 2014 WL 12769113, at *2 (S.D.N.Y. July 25, 2014). Courts in the Second Circuit have found that "[n]ew and material information for Section 3142(f)(2)(B) purposes consists of something other than a defendant's own evaluation of his character or the strength of the case against him: truly changed circumstances, something unexpected, or a significant event." United States v. Esposito, 354 F. Supp. 3d 354, 358-59 (S.D.N.Y. 2019) (citation omitted).

Moreover, because the Bail Reform Act states only that a hearing "may" be reopened if new and material information is presented, it "leaves the decision to reopen a hearing to the sound discretion of the district court." Zhang, 55 F.4th at 148. Therefore, even if the defendant's arguments for reopening the hearing met the standard—which they do not—this Court may still decide in its discretion not to reopen the hearing. Id.

B. The Defendant Should Remain Detained Because He Defrauded Victims While Out on Release

The defendant should remain detained because he defrauded victims while out on pretrial release – that is enough. In direct violation of his conditions of release, and despite repeated warnings from the Court, the defendant communicated with his victims, and defrauded them further. (Affidavit ¶¶ 63-107). He defrauded individuals and financial services companies. (Affidavit ¶¶ 108-120). Through his schemes, the defendant has shown that he cannot be trusted and cannot be monitored while on pretrial release. The defendant did not make a one-time mistake. Instead, he flagrantly violated this Court's orders, on a near daily basis, because of his greed.

As this Court is aware, defendants, including those charged with white-collar crimes, are regularly detained when they commit crimes while on pretrial release. See, e.g. United States v. Dupree, 833 F. Supp. 2d 241, 247 (E.D.N.Y. 2011) (denying pretrial release to defendant that was originally charged with fraud and then detained for participating in another fraud while on release); United States v. Alli, No. 2:22-CR-00395 (GRB)(JMW), 2024 WL 3520450, at *2 (E.D.N.Y. July 24, 2024) (denying pre-sentence release and forfeiting bond for white-collar defendant who engaged in wire fraud post-plea); United States v. Romano, 2013 U.S. Dist. LEXIS 125574, *7 (noting that the defendant's bail was revoked when the defendant participated in a second "coin fraud scheme" while on pretrial release); United States v. Singh, 15-CR-450, Dkt.

No. 25 (JMA)(AKT) (defendant remanded to BOP custody by Judge Tomlinson for committing additional acts of wire fraud while on pretrial release); United States v. Ciccone, 12-CR-357, Dkt. No. 154 (defendant remanded to BOP custody by Judge Tomlinson for committing crimes while on pretrial release); see also United States v. Khan, No. 19-CR-00511 (ENV) (E.D.N.Y. July 25, 2024) (post-conviction, while violation of supervised release was pending, defendant committed additional fraud crimes and was remanded). There is nothing unusual about the defendant's detention, especially given his flagrant violations of his bond and the danger he poses to victims and witnesses.

C. The Defendant Should Remain Detained Because He Attempted to Bribe Government Officials While Out on Release

Of course, the defendant's conduct here is much more egregious than "only" defrauding individuals. The defendant also attempted to bribe government officials while on pretrial release – he spent tens of thousands of dollars to pay off government officials. (Affidavit ¶ 121). Again, this alone is enough to detain the defendant. Months after he was detained, Adam Kaplan was still attempting to use CC-1 to bribe "Chief" with cash in an envelope – of course, if successful, that would not be traceable. His actions to avoid the standard judicial process show that this defendant cannot be trusted outside of the MDC.

D. The Defendant Should Remain Detained Because He Is a Physical Danger to Others

But, of course, for this defendant, there is so much more. The defendant has shown through his actions that he is a real, physical danger to others, including victims and witnesses. It is clear from the Affidavit that this defendant tried to physically harm people. (Affidavit ¶¶ 24-44). He tried to intimidate them, scare them, and physically harm them because they were victims of his crimes and because they could serve as witnesses against him. There is a bright line that individuals are either willing to cross or not, and this defendant has shown, repeatedly, that when he is backed into a corner, he is willing to cross that line.

As noted throughout the Affidavit, the defendant told CC-1, who he believed was a violent person with connections to violent people, that he should "kaboom," meaning hurt people. He told CC-1 that someone needed to "fear." He wanted someone to be "peeing blood." He wanted someone "missing teeth." He wanted people to be "scared." "Fear must be instilled." He had skull and crossbones imagery sent to people. He said, "I like the sound of a wake-up blow." He said, "put her phone on fire. Let her block that. Seriously, please blow it up." The defendant is someone that wanted to, and attempted to, hurt people. It is by pure luck that the defendant did a poor job choosing his coconspirator on these occasions. It is by pure luck that CC-1 was able to trick the defendant into believing that CC-1 could carry out these tasks. Again, the defendant cannot be trusted to refrain from this conduct outside of the MDC.

E. The Defendant Should Remain Detained Because He Is a Significant Threat to Obstruct Justice or Flee

The defense argues that because the defendant "would never wish to return to the inhumane conditions at MDC Brooklyn, any chance that he might seek to engage in witness

intimidation or tampering has been reduced to zero" (Bail Motion at 19). The exact opposite is true. Now, as we get closer to trial, and assuming, arguendo, what the defendant has said about MDC is true[2], the defendant will get only more desperate. The defendant is, more than ever, backed into a corner. The evidence in this case is absolutely overwhelming. Dozens of witnesses are prepared to testify that the defendant defrauded them. Bank records, records from other financial institutions, including the defendant's financial services firm, communication records (including emails and texts), and phone recordings will prove beyond a reasonable doubt that this defendant is guilty. And the defendant understands that his United States Sentencing Guidelines range is well over a decade given the crimes charged in the Indictment, not including what has not yet been charged – attempting to threaten and injure witnesses, bribe law enforcement officials, committing crimes while on release, and continuing to defraud others. Given the overwhelming evidence, the high probability that the defendant will spend a significant amount of time in prison, and the defendant's subjective "frightening" experience at the MDC, the defendant will only further be incentivized to flee or engage in obstructive conduct.

F. The Defendant Should Remain Detained Because He Cannot Be Adequately Monitored by Pretrial Services

This defendant has shown, repeatedly, that he will do anything to avoid the consequences of his actions. And given the defendant's capabilities and prior conduct, it would be impossible for pretrial services to adequately monitor him. The defendant, while on release, was using not one, but multiple "burner" phones that were not in his name – even if the defendant were confined to his home and "permitted" only one cellular device, pretrial services would have no way to know what the defendant was doing. The defendant used CC-1 to speak to his victims – again, even if the defendant were confined to his home and allowed only one cellular device, pretrial services would still have no way to know what the defendant was doing. The defendant used aliases and repeatedly told CC-1 to avoid using the defendant's name. The defendant paid others to put up fake, irrelevant press releases to hide the Indictment and Securities and Exchange Commission charges from his victims. The defendant's money laundering in this case was incredibly extensive. The defendant used several different email addresses. He hid cash payments in chocolate boxes. None of these actions would be prevented, or will be prevented in the future, by the proposed release conditions. Each of the defendant's crimes was possible from the comfort of his home while using a burner phone. These are not hypotheticals. The defendant, on a $2.5 million bond, secured by his parents, and with the threat of incarceration at the MDC, engaged in this conduct.

The other proposed conditions offer no comfort. Pretrial services does not have the resources to monitor a "live feed" at all hours of the day, nor would that prevent the defendant from committing crimes from a burner phone or internet-capable device from his home. The defendant was already subject to pretrial supervision, and was not permitted to communicate with his victims. Instead, he used others to communicate with them on his behalf.

---

[2] There is no record of the defendant complaining to medical services at MDC of being bitten by rats, [redacted].

Frankly, the proposed release conditions appear to basically mirror the prior conditions, which the defendant flagrantly and repeatedly violated for over a year. The defendant appears to even state that the Court should use the same properties that the government has moved to forfeit based on the defendant's prior conduct. And even the "strict" home detention is not strict – the defendant will apparently constantly leave his apartment for "attorney visits" or "medical appointments" or "religious services" or "other activities" approved by pretrial services. Further, the conditions allow the defendant to be visited, with no oversight, by his parents, who are either victims or coconspirators (or both) of his fraudulent conduct[3], and his brother, who has been indicted as a coconspirator with the defendant.

The defendant continues to engage in concerning conduct with his parents. When speaking to them from the MDC, the defendant has routinely spoken in code (and, since September, almost exclusively in broken Hebrew), apparently to avoid law enforcement's understanding. For example:

| | |
|---|---|
| Adam Kaplan: | "I'm at a loss here." |
| Adam Kaplan's Mother: | "My ink writing instrument will no longer be operational." |
| Adam Kaplan: | "Not that…gasoline." |
| Adam Kaplan's Father: | "Alright. We should stop." |
| Adam Kaplan: | "He goes for gas." |
| Adam Kaplan's Father: | "OK. Everything is good." |

(September 15, 2024 at 1:00 PM).

The defendant has even reminded his parents to watch what they say because jail calls are monitored:

| | |
|---|---|
| Adam Kaplan: | "Did you speak with everyone . . . You're on the radio here." |

(September 15, 2024 at 8:25 AM).

The defendant has shown, time and again, that he cannot be supervised effectively. He is a serious danger to others and the judicial process. He should remain detained.

---

[3] The defendant used his parents' credit cards as part of the fraud against certain credit card companies. (Affidavit ¶¶ 108-111, 115-118, 120). During the relevant period of the scheme, the defendant's mother also sent the defendant's brother altered receipts from a victim that she seems to have manipulated, which were used as part of the fraud scheme.

The defense does not even attempt to articulate who could serve as a suretor for the defendant, given that much of his extended family has been victimized by his crimes, and the current suretors (his parents) are subject to a $2.5M forfeiture, which they apparently oppose.

G. The Defendant's Complaints About MDC and [REDACTED] Do Not Change the Calculation

Unable to contend with any of the above, the defendant instead focuses on the MDC and [REDACTED]. Regarding the MDC, following the logic of the defense's arguments here, no individual should be subject to incarceration pending trial. That is wrong. If a Court finds, as this Court has found, that no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person and the community, the defendant must be detained.

i. The Defendant Can Adequately Prepare for His Defense

The government adds the following additional information for the record given that the defendant argues in the Bail Motion that he should be released to prepare for trial (Bail Motion at 29-32). The MDC has provided the defendant with more than reasonable accommodations to meet with counsel. The defendant is permitted to meet with counsel each day. Records also indicate that the defendant frequently communicates with his attorneys by telephone and written communication. MDC's procedures do not infringe on the defendant's constitutional right to effective counsel or to participate in his defense. See United States v. El-Hage, 213 F.3d 78, 81-82 (2d Cir. 2000) (holding pretrial detention conditions, which included solitary confinement, restricted phone access, and a chair to review discovery more comfortably were reasonably related to defendant's specific security concerns and did not impermissibly infringe the defendant's ability to prepare his own defense); United States v. Mohamed, 103 F. Supp. 3d 281, 289-96 (E.D.N.Y. May 1, 2015) (same); United States v. Hashmi, 621 F. Supp. 2d 76, 86-87 (S.D.N.Y. 2008) (same); United States v. Kassir, No. S2 04 Cr. 356 (JFK), 2008 WL 2695307, at *2-5 (S.D.N.Y. July 8, 2008) (same).

Moreover, defense counsel's proposal that the defendant must be released in order to prepare his defense is inconsistent with the Bail Reform Act, which contemplates that courts will weigh dangerousness and risk of flight against a defendant's opportunity to prepare for trial. In this case, the significant danger that the defendant poses weighed against the opportunities the MDC has provided the defendant to meet privately with his attorneys clearly counsels in favor of the defendant's continued detention. See United States v. Argraves, 2010 WL 283064 (D. Conn. Jan. 22, 2010) at *6 ("Pre-trial detention will always interfere with preparation for trial to some extent, but the Bail Reform Act clearly contemplates this problem and allows for detention provided that the defendant is 'afforded reasonable opportunity for private consultation with counsel.'" (quoting 18 U.S.C. § 3142(i)(3))).

Finally, voluminous discovery alone is not a basis for release under either the Bail Reform Act or the Sixth Amendment. The defendant does not point to any case law suggesting that discovery of the kind produced in this case requires the defendant's release under 18 U.S.C. § 3142(i), nor can he. See Dupree, 833 F. Supp. 2d at 249 ("While this [fraud] case may, in fact, be complicated and require Defendant to review hundreds if not thousands of documents and meet with his lawyers for dozens of hours, that fact, standing alone, simply does not justify Defendant's release . . . . Indeed, accepting such an argument would mean that the more complicated the crime, the more likely a defendant should be released prior to trial. This is clearly an absurd result." (citation omitted)). The Bail Reform Act does not mandate the defendant's release even if review

of discovery would be more convenient outside the MDC. See id. at 248 (holding that even where "release would certainly make it more convenient for him and his counsel to prepare his defense," release was not "necessary" given substantial accommodations for discovery review).

ii.

Respectfully submitted,

BREON PEACE
United States Attorney

By: /s/
Adam Toporovsky
Paul Scotti
Assistant U.S. Attorneys
(631) 715-7846 (Toporovsky)