CMM:PGS/AT/RMU
F.#2022R00047

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA

     - against -

ADAM KAPLAN and
DANIEL KAPLAN,

                Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - X

Docket No. <u>23 CR 293 (S-1)(JMA)</u>

MEMORANDUM OF LAW IN OPPOSITION TO
<u>THE DEFENDANTS' MOTIONS IN LIMINE</u>

JOSEPH NOCELLA, JR.,
United States Attorney
Eastern District of New York
610 Federal Plaza
Central Islip, New York 11746

Adam R. Toporovsky
Paul G. Scotti
Rebecca M. Urquiola
Assistant U.S. Attorneys
    (Of Counsel)

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ............................................................................... 1

ARGUMENT ......................................................................................................... 3

I.   The Court Should Allow the Admission of Certain Evidence Regarding IHT and its Investigation of the Defendants, Including that the Defendants Were Fired from IHT ..... 3

II.  The Government Does Not Intend to Introduce Evidence Pertaining to the Adult Protective Services' Investigation as to ████████ ............................................... 7

III. The Government Should Be Permitted to Elicit Testimony About Victims' Views of Fees, IHT Procedures, and the Defendants' Noncompliance with Those Procedures ....... 7

IV.  The Court Should Admit Evidence From Daniel Kaplan's iCloud Account ..................... 8

V.   The Court Should Admit Evidence of Adam and Daniel Kaplan's Familial Relationship as Further Evidence of the Conspiracy ..................................................... 10

    A.  Evidence of the Defendants' Close Personal Relationship is Direct Evidence of the Charged Conduct ............................................................................ 11

    B.  Evidence of Adam and Daniel Kaplan's Relationship is Not Prejudicial .................. 14

VI.  The Court Should Allow the Government to Elicit Testimony From CC-1 as There Are No *Massiah* Violations ........................................................................... 14

VII. The Court Should Admit Evidence of Adam Kaplan's Attempted Obstruction ............. 21

VIII.   The Government Does Not Dispute Adam Kaplan's Motion to Preclude Evidence Regarding Potential Travel ................................................................... 24

IX.  The Government Does Not Seek to Introduce Evidence of Adam Kaplan's Meeting with President Trump, and Does Not Object to Adam Kaplan's Use of Evidence of CC-1's Criminal History ............................................................................ 24

X.   Adam and Daniel Kaplan's Motions Regarding the Exclusion of Evidence Pursuant to Federal Rules of Evidence 401 And 403 Are Non-Issues and/or Meritless ..................... 24

    A.  Kaplan Unlimited .......................................................................... 24

    B.  Reference to "Kaplans" .................................................................... 25

    C.  Victim Testimony .......................................................................... 26

    D.  Daniel Kaplan's Assets .................................................................... 27

i

E.  Harm to Well-Being ..................................................................................... 29

F.  Ponzi Evidence ......................................................................................... 31

XI. The Court Should Permit the Government's Summary Witness to Hear Other Witnesses at Trial .................................................................................................. 32

CONCLUSION ...................................................................................................... 33

## PRELIMINARY STATEMENT

The government respectfully submits this memorandum in opposition to defendant Daniel Kaplan's motions in limine (the "D. Kaplan Motion" or "D. Mot.", see ECF No. 254) and defendant Adam Kaplan's motions in limine (the "A. Kaplan Motion" or "A. Mot.", see ECF No. 255 and together the "Motions" or "Mots."). The defendants submitted the following motions in limine requesting the following relief:

1. The Court preclude the government from admitting evidence concerning IHT's investigation into Adam Kaplan and Daniel Kaplan, as well as evidence of complaints by Adam Kaplan's and Daniel Kaplan's clients through IHT witnesses;

2. The Court preclude evidence pertaining to the Adult Protective Services Investigation as to victim ████████;

3. The Court preclude evidence of Adam Kaplan's and Daniel Kaplan's abnormal and/or unethical business practices;

4. The Court preclude evidence from Daniel Kaplan's alleged unauthenticated iCloud Account, which the defendants' counsel produced to the government and the Securities and Exchange Commission ("SEC");

5. The Court preclude evidence of Adam Kaplan's and Daniel Kaplan's close familial relationship as evidence of the conspiracy;

6. The Court preclude evidence concerning Adam Kaplan's and Daniel Kaplan's deliberate refusal and failure to comply with IHT policies and evidence of actions taken by financial regulators;

7. The Court suppress statements supposedly "elicited" by CC-1 pursuant to Massiah (second motion);

8. The Court preclude evidence regarding Adam Kaplan's efforts to remove a member of the prosecution team from the case by attempting and failing to gather negative information about him;

9. The Court preclude evidence of Adam Kaplan's inquiries and intent to flee, including inquiring about CC-1's time living in Costa Rica;

10. The Court preclude evidence of Adam Kaplan's alleged meeting with President Trump;

11. The Court preclude evidence pertaining to Kaplan Unlimited;

12. The Court preclude the government from referencing "the Kaplans" in certain circumstances despite the defendants' sharing the same surname, "Kaplan," and the fact that they conspired to commit many of the crimes alleged in the Superseding Indictment;

13. The Court preclude the government from calling twenty-four victims despite the number of substantive counts alleged in the Superseding Indictment and the commission of four separate conspiracies;

14. The Court preclude the government from introducing evidence pertaining to Daniel Kaplan's assets and income;

15. The Court preclude the government from introducing evidence of harm to victims' mental health and well-being;

16. The Court preclude the government from referencing a "Ponzi" scheme or "Ponzi-like" payments or other supposedly "pejorative" terms under Federal Rules of Evidence 401 and 403;

17. The Court allow Adam Kaplan to introduce evidence of CC-1's prior convictions, although some are more than 10 years old; and

18. The Court "sequester" all witnesses from the courtroom during the testimony of other witnesses.

The vast majority of defendants' motions are meritless, irrelevant, or moot, and the Court should deny them in whole or in part.

## ARGUMENT

I.    The Court Should Allow the Admission of Certain Evidence Regarding IHT and its Investigation of the Defendants, Including that the Defendants Were Fired from IHT

After several complaints from victims, in 2020 and 2021, reached IHT management, IHT conducted an internal investigation of the defendants and found that the defendants had lied and stolen from victims.  In July 2021, IHT then swiftly fired the defendants and alerted the defendants' victims that the defendants had been fired.  Thereafter, IHT contacted the defendants' victims and learned that the defendants had defrauded dozens (if not hundreds) more individuals.  Post-firing, while engaged in conversations with victims, IHT continued to investigate the defendants and learned that the defendants had consistently fraudulently overbilled victims, and stolen money from victims' bank accounts (and from loans taken out by the defendants in victims' names).  Daniel Kaplan argues that any findings regarding any IHT investigation of the defendants should be precluded as (1) expert testimony based on hearsay (client complaints); (2) hearsay; and (3) the evidence would be "highly prejudicial and of negligible probative value, if any.".  See D. Kaplan Mot. At 2-4.  This is wrong.  And although the government does not intend to go into depth, with any witness, about IHT's investigation, Daniel Kaplan's motion goes too far and, as discussed below, the government should be permitted to introduce evidence gathered as part of that investigation.

Specifically, the government intends to offer testimony from several victim witnesses that the defendants were fired, which was the result of IHT's investigation.  Several victim witnesses will testify that the defendants told them that they were fired, and that the defendants – both Daniel Kaplan and Adam Kaplan – told the victim witnesses how to reply to the IHT email notifying them about the firing.  Under a Rule 403-balancing test, this evidence is plainly admissible.  These instructions from Daniel Kaplan and Adam Kaplan are relevant and

3

probative of the defendants' consciousness of guilt and probative of the victims' trust of the defendants. The defendants used that trust to take advantage of their victims and steal their money.

The "unfair" prejudice is also minimal. Of course, the fact of the defendants' firing from IHT is no more prejudicial than the fact that the defendants were charged by indictment by the United States for their crimes. The understanding that IHT fired the defendants is part of the government's story, not just to the original fraud and concealment, but also as to Adam Kaplan's later illegal conduct. As noted in Old Chief v. United States, 519 U.S. 172, 187, 117 S. Ct. 644, 653, 136 L. Ed. 2d 574 (1997), "[t]he 'fair and legitimate weight' of conventional evidence showing individual thoughts and acts amounting to a crime reflects the fact that making a case with testimony and tangible things not only satisfies the formal definition of an offense, but tells a colorful story with descriptive richness." It is of course the "accepted rule" that the prosecution is "entitled to prove its case[.]" Id. at 189.

Regarding the investigation itself, the government has no plans to introduce testimony of what the July 2021 IHT investigation entailed, shortly before the defendants' firing, and post the defendants' firing. However, the defendants committed the instant crime, in part, while employed at IHT. Accordingly, the government intends to introduce testimony and records from IHT regarding, among other things, who the defendants' customers were, how IHT billed the defendants' clients, who input what information into the billing system, how that information was managed, and who uploaded the altered, forged, and fraudulent advisory agreements. Although IHT witnesses may have compiled some of that data as part of their investigation, the government is not seeking to offer why they gathered this information, just the information itself.

The government also intends to introduce testimony from ████████████ who owned a consulting firm – ████████████ Consulting LLP – and was providing consulting

4

services to IHT regarding compliance while the defendants were employed at IHT.  The government intends to elicit testimony from ████ outlining IHT's policies and procedures (including the IHT Compliance Guide), and specific orders that ████ provided to Daniel Kaplan and Adam Kaplan.  Without going into detail as to why those instructions were provided – that is, in response to a victim complaint – the government intends to elicit testimony about the purpose of IHT's procedures generally and the specific orders that were given to Daniel Kaplan and Adam Kaplan.  Moreover, the government plans to introduce evidence of several email exchanges between ████ and Daniel Kaplan and Adam Kaplan regarding IHT's procedures and a specific instance of an advisory fee form that did not include fees in the form.

Regarding the procedures referenced above, IHT policies stated that the firm billed clients, and investment advisors (such as the defendants) were not to bill clients directly.  Firm policy also required, for compliance purposes, that investment advisors (such as the defendants) disclose outside business activities.  The evidence at trial will show that the defendants violated those procedures to conduct their fraudulent scheme.  Evidence of the defendants' purposeful violations of these procedures to conduct their fraudulent scheme is relevant and probative of the defendants' guilt.

Daniel Kaplan also argues that written materials created by IHT or financial institutions that document victim complaints must be barred because those materials contain "impermissible hearsay" (see D. Mot. at 5-7.)  To the extent that those materials contain double hearsay (such as situations where the complaint itself does not fall within a hearsay exception, such as present sense impression, excited utterance, or then-existing condition), the government agrees.  The government disagrees that the IHT documents themselves are hearsay because they are permissible business records.  The defendants were well aware that IHT was required to store

communications between clients and employees of IHT for regulatory purposes, and IHT regularly did store those communications in its course of business.

The government also notes that it is permissible for the government to refresh a victim witness's recollection with their own written complaint, and, if that victim's memory is not sufficiently refreshed, introduce evidence of the victim's complaint under Federal Rule of Evidence 803(5).

To be clear, on many occasions, the defendants stole money from their victims through fraudulent and illegal charges, and on some of those occasions, victims disputed the defendants' fraudulent and illegal charges to financial institutions.  The government will elicit testimony at trial from those victims about the disputed charges, and those disputes are noted in financial institution records, which the government will seek to admit into evidence.  The defendants then challenged those disputes and provided fake and forged "evidence" for the fraudulent charges.  The defendants' provision of fake and forged "evidence" of the charges is relevant and direct evidence of the charged scheme, and, moreover, is probative of their guilt and consciousness of guilt.

Separately, although the victim complaints reflected in the financial institution business records are "true" (the defendants' charges are fraudulent) and the victims will testify that their complaints are true (meaning, the charges were fraudulent), those records are not being introduced for their truth.  They are being introduced to show that when victims disputed charges, the defendants lied about the records' purposes and forged their victims' signatures.  Those records

are admissible.  The government has no intention to interrogate an IHT witness about victim complaints.[1]

II.    The Government Does Not Intend to Introduce Evidence Pertaining to the Adult Protective Services' Investigation as to ███████████

    Daniel Kaplan moves to preclude the admission of evidence as to an investigation by Adult Protective Services ("APS") made by a social worker familiar with the financial fraud conducted against victim, ███████████ by Adam and Daniel Kaplan.  See D. Kaplan Motion at 7.  Based on correspondence between the social worker and a representative from APS, it appears as though the social worker alerted APS in the Summer of 2021 of the elder abuse against ███████ and provided ███████ financial records to APS as evidence of said abuse.  See EPROD_FBI-000000069; EPROD_FBI-000000230; EPROD_FBI-000013549.  The government intends to call ███████████ at trial and listed her on its witness list; however, the government does not intend to refer to the APS investigation during its direct examination of the witness.  Should the defendants open the door during cross-examination of this witness, the government reserves the right to use the existence of an APS investigation in its re-direct of the witness.  Accordingly, D. Kaplan's Motion on this issue is moot.

III.    The Government Should Be Permitted to Elicit Testimony About Victims' Views of Fees, IHT Procedures, and the Defendants' Noncompliance with Those Procedures

    Daniel Kaplan next argues that the government should be precluded from introducing evidence from an IHT witness that the defendants' business practices, including fee percentages, were outside industry norms.  See D. Kaplan Motion at 8-9.  The government has no

---

[1]    The defendants provided many of the fake, altered, and forged records to the government and to the Securities and Exchange Commission ("SEC") as well.  A defendant providing fake, altered, and forged evidence to the government obviously evidences a consciousness of guilt as well, and the government is prepared to argue as such to the jury.  These documents are admissible for that purpose as well.

intention of introducing such evidence.  Certain victim witnesses will testify as to what their perceptions of what a "standard" fee was when explaining to the jury why they agreed to a 1% (or less) fee.  The victim witnesses' explanation for why they agreed to a 1% (or less) fee is probative of the fact that they agreed to a 1% (or less) fee, which, when taken in combination with the victims' forms containing fees higher than 1%, is relevant and probative of the fact that the defendants committed the crimes alleged in the superseding indictment.  Thus, given that this evidence is relevant and probative of the defendants' guilt, and not unfairly prejudicial, the government intends to offer such evidence.

As stated above, the government intends to call an IHT witness to discuss IHT's compliance procedures regarding billing.  Adam Kaplan's and Daniel Kaplan's billing was not in compliance with these procedures, which, the government will argue was part of their scheme. For example, Adam and Daniel Kaplan were not permitted to bill clients separately from IHT. Nevertheless, the defendants routinely did just that to steal millions of dollars from their clients. The government has no intention of asking an IHT witness whether that is "appropriate" or "industry standard".  Just as to it not being permitted by IHT and why.  That Daniel Kaplan and Adam Kaplan repeatedly violated those rules, even after being specifically reminded of them and ordered to follow them, is probative of their guilt and admissible under Fed. R. Evid. 402 and 403. The defendants are free to cross examine IHT witnesses.

IV.    The Court Should Admit Evidence From Daniel Kaplan's iCloud Account

Daniel Kaplan next argues that the government should be precluded from introducing evidence from the ███████████ iCloud Account (the "DK iCloud Account") because it is "unauthenticated".  See D. Kaplan Motion at 9-11.  To be clear, the defendants produced communications ostensibly from the DK iCloud Account to the SEC in response to subpoenas and separately to the government.  Those documents are obviously

authentic as productions from the defendants, even if many of the documents that the defendants produced are fake or forged, and were apparently created to obstruct investigations into the defendants. The government plans to introduce evidence that the defendants produced these records, through their attorneys, to regulators and the government, and the fact that the records were false. That is relevant information that is probative of the defendants' guilt.

In arguing that the government cannot authenticate the content of the messages from the DK iCloud Account, Daniel Kaplan cites United States v. Hunt, 534 F. Supp. 3d 233 (E.D.N.Y. 2021) for the proposition that, in sum and substance, even a record certification is not enough for authentication when the government is seeking to introduce evidence that an individual made particular statements in the document. Hunt at 253. In Hunt, the government obtained certified records from social media companies, and requested that it be permitted to authenticate admitted statements that the defendant made on those social media platforms through Rule 902 certifications. The court held that if the government was seeking to introduce the "content" of the social media posts, those items are not self-authenticating.

The defense ignores that the Hunt court held that "[t]his is not to say that a certification is irrelevant for purposes of authenticating social media content. Under Rule 901, there is a wide variety of extrinsic and circumstantial proof that may be used to authenticate evidence[.]" Id. at 255. And "there need only be sufficient proof 'so that a reasonable juror could find in favor of authenticity or identification[.]'" Id. In all, the Hunt court found only that "the Government may not rely solely on certifications to authenticate and admit the content of messages or videos on Defendant's social media accounts; such certifications remain one of the many ways the Government may demonstrate authenticity under Rule 901(a)." Id.

Thus, although Daniel Kaplan argues that the government "cannot meet its burden of authenticating these communications," there is ample evidence that Daniel Kaplan was the owner and user of the DK iCloud Account, which the government will introduce at trial, including numerous business records from several institutions, including Apple, and emails from "█████████████████ where the writer of the email states that his name is "Daniel Kaplan". For example, one record produced by Apple in response to a subpoena (KAPLAN000001, which was produced to the defendants in 2023), states that for the Apple ID "█████████████ the "First Name" is "Daniel" and the "Last Name" is "Kaplan", and the address for the account is Daniel Kaplan's parents' home address in Great Neck.  The "Game Center Nickname" is "Dan$TheMan". Any argument that Daniel Kaplan did not use the DK iCloud Account is one that Daniel Kaplan can make to the jury – that evidence goes to weight, not to admissibility.[2]

V.   The Court Should Admit Evidence of Adam and Daniel Kaplan's Familial Relationship as Further Evidence of the Conspiracy

Daniel Kaplan argues that evidence of the defendants' relationship as evidence of the conspiracy is more prejudicial than probative.  See D. Motion at 11-12.  The defendant is wrong.  As discussed below, the Court should permit this evidence because Daniel Kaplan's and Adam Kaplan's close familial relationship goes to the heart of the charged conspiracy.

---

[2]   It is unclear what specific communications Daniel Kaplan refers to in this motion in limine.  In some instances, victim witnesses will also testify that they were the recipient of the communications, and that they were communicating with Daniel Kaplan.  Daniel Kaplan also argues that the government will offer communications as "either Daniel or Adam, or both".  Such an offer would be admissible and would clearly satisfy the requirements of Federal Rule of Evidence 901.  Daniel Kaplan and Adam Kaplan are charged in a conspiracy and with violations of Title 18, United States Code, Section 2.  The government will argue to the jury that Daniel Kaplan and Adam Kaplan worked together to steal money from victims.  There is no alternative theory, or any evidence in the record, that anyone other than Daniel Kaplan and Adam Kaplan sent the communications at issue in this case.

A.    Evidence of the Defendants' Close Personal Relationship is Direct Evidence of the Charged Conduct

The defendants are both charged with conspiracy to commit wire fraud and conspiracy to commit money laundering. Thus, it is entirely appropriate and consistent with the charges in this case for the government to refer to these conspiracies as the collective units that they were. Daniel Kaplan argues that the brothers' "similarities and the overlap of their lives create an enormous risk that the jury will conflate evidence about one with evidence that is attributed only to the other." D. Mot. at 12. This contention is without merit. The evidence fully supports referring to the close familial relationship between the defendants because at the time the defendants engaged in the charged offenses, they, together, were running a scheme to defraud over 50 investors.

The evidence of their close relationship throughout the conspiracy is properly admissible "if it arose out of the same transaction or series of transactions as the charged offense, if it is inextricably intertwined with the evidence regarding the charged offense, or if it is necessary to complete the story of the crime on trial." United States v. Carboni, 204 F.3d 39, 44 (2d Cir. 2000) (quoting United States v. Gonzalez, 110 F.3d 936, 942 (2d Cir. 1997)). The Second Circuit has repeatedly held that evidence of "other" or "uncharged" acts or crimes is admissible to complete the story of the charged crimes and to establish the existence of the charged conspiracy. "[W]here, as here, a conspiracy is charged, uncharged acts may be admissible as direct evidence of the conspiracy itself." United States v. Baez, 349 F.3d 90, 93 (2d Cir. 2003) (internal quotation marks omitted) (upholding district court's admission of sixteen uncharged robberies). In addition, the government is permitted to introduce evidence of the relationship between co-conspirators outside of the charged conspiracy because it shows "the development of a relationship of trust between the participants." See United States v. Alston, No. 15-CR-435 (CM), 2016 WL 5806790,

*2, (S.D.N.Y. Sept. 27, 2016) (citing United States v. Pascarella, 84 F.3d 61, 73 (2d Cir. 1996));

see also United States v. Ashburn, No. 11-CR-303 (NGG), 2015 WL 862118, *1-2 (E.D.N.Y. Feb.

27, 2015) (Evidence of a prison visit by an uncharged co-conspirator admissible as direct evidence

because it "is direct evidence of the relationship between co-conspirators, and is relevant for that

reason."); United States v. Nguyen, 493 F.3d 613, 624 (5th Cir. 2007) (affirming the district court

where admissible evidence at trial against twin brothers charged in a conspiracy showed "the

Nguyens' knowledge that they were facilitating a conspiracy to defraud lenders, that they were

defrauding banks through their actions, and that they were facilitating the use of proceeds from

illegal activity.").

      Adam and Daniel Kaplan's strong personal and professional relationship is

admissible because it is intertwined with the evidence at trial, is necessary to complete the story

of the crime, and demonstrates the relationship between the co-conspirators even after their

termination from IHT.  As an initial matter, Adam Kaplan and Daniel Kaplan have been linked for

most of their professional adult lives.  They both graduated from The University of Rochester, they

worked together as financial advisors at both Morgan Stanley Wealth Management ("MS") and

Merrill Lynch, Pierce, Fenner & Smith Incorporated ("ML"), and they both worked at IHT as

investment advisors at the same time.  Their close relationship and clear loyalty to one another is

directly relevant to any determination of whether the defendants conspired to commit wire fraud

and money laundering in their capacities as investment advisors.

      Moreover, the relationship between the defendants is central to the charged

conspiracies as there will be voluminous evidence presented regarding their professional and social

relationships, including, but not limited to, attending Harvard University networking events

together to attract future investors, traveling and meeting with clients together to pitch investment

opportunities, victims testifying that they were introduced to Adam and Daniel Kaplan as twins who worked together in investment advising, and sending each other client contracts and financial institution documents over text and e-mail.  Further, it would be completely nonsensical to preclude evidence of the relationship as the defendants share the same last name, making it obvious to the jury that they are brothers.

That this relationship of trust continued unabated even after they were terminated from IHT and their misconduct was revealed is probative of both defendants' guilt as to the charged crimes.  The defendants endeavored to conceal their fraud by attempting to pay back their victims and dissuade them from believing that the defendants had engaged in any kind of misconduct.  Once again, victims will testify that both Adam Kaplan and Daniel Kaplan reached out to cover their illicit activity after their termination from IHT.

In sum, the jury will be presented with evidence regarding the relationship between the defendants, and it is important for them to understand that the relationship withstood allegations of misconduct and fraud from several financial institutions.[3]

---

[3]    The defendants' close relationship is also relevant to helping the jury understand the development of the scheme and the level of trust among the defendants.  See United States v. Pipola, 83 F.3d 556, 565–66 (2d Cir.1996) (finding no error in trial court's admission of evidence of co-conspirators' prior acts, including "committing crimes including armed robberies and a burglary, and using and selling stolen and counterfeit credit cards," because the challenged evidence "explained to the jury how the relationship between Pipola and his underlings evolved" and "made the ... conspiracies to commit armed robberies [later committed by the co-conspirators] more plausible"); see also United States v. Barret, No. 10-CR-809 (S-3) KAM, 2011 WL 6704862, at *12 (E.D.N.Y. Dec. 21, 2011), aff'd, 677 F. App'x 21 (2d Cir. 2017) (holding that there was probative value of introducing background evidence regarding co-conspirators' roles in the gang and the historical development of their relationship).  The background evidence of the defendants' historical relationship and their continuous work as investment advisors together, is essential in understanding the conspiracies themselves.  Accordingly, the evidence's probative value significantly outweighs any risk of prejudice posed and therefore should be admitted.

B.    Evidence of Adam and Daniel Kaplan's Relationship is Not Prejudicial

Finally, the Court should reject defense counsel's argument that the government's introduction of evidence of a close familial relationship will cause the jury to automatically conflate evidence and attribute evidence of Adam Kaplan's guilt to Daniel Kaplan. See generally, D. Mot. at 12. While the government does not agree that such evidence would invite the jury to misattribute any evidence, any risk is addressed by jury instructions.

The jury instructions will surely make clear that the jury should consider whether each defendant knowingly and intentionally participated in the charged conspiracies. The instructions will also signal that mere association does not make a person a member of a conspiracy. Despite Daniel Kaplan's contention that an instruction to the jury "will not suffice," jury instructions will certainly address any concerns regarding prejudice. See Weeks v. Angelone, 528 U.S. 225, 234 (2000) ("A jury is presumed to follow its instructions.")

VI.    The Court Should Allow the Government to Elicit Testimony From CC-1 as There Are No *Massiah* Violations

For the reasons stated in the government's opposition to the defendants' pre-trial motions (ECF No. 198, the "Pre-Trial Opposition Brief"), Adam Kaplan's arguments regarding Massiah v. United States, 377 U.S. 201 (1964) are not persuasive and should be rejected.[4] The Pre-Trial Opposition Brief is incorporated by reference here.

---

[4]    To be clear, Adam Kaplan now seems to agree that any statements made by Adam Kaplan between when he first met CC-1 and April 2024 are not subject to suppression, and those statements include statements made by Adam Kaplan about threatening, injuring, intimidating and bribing victim witnesses, creating fake evidence, attempting to bribe Department of Justice officials, and engaging in a conspiracy to commit wire fraud with CC-1. See A. Motion at 6-7 (seeking to suppress only from April 2, 2024 forward). The government will seek to elicit testimony from CC-1, and introduce the conversations between CC-1 and Adam Kaplan, at trial. Those communications are relevant and probative of the fact that Adam Kaplan committed the

First, as explained in the Pre-Trial Opposition Brief, the Sixth Amendment right to counsel is "offense specific" and no constitutional violation arises from the questioning of a represented defendant with respect to criminal conduct for which the right to counsel has not attached.  McNeil v. Wisconsin, 501 U.S. 171, 175 (1991); United States v. DeVillio, 983 F.2d 1185, 1190-92 (2d Cir. 1993) (undercover conversations between informant and represented defendants about additional robberies for which defendants had not been indicted did not violate Massiah); Alexander v. State of Conn., 917 F.2d 747, 750 (2d Cir. 1990) (no Massiah violation when defendant was in custody and a "police agent" – a friend of the defendant's – elicited statements about uncharged crimes).  The Supreme Court has explicitly rejected the notion that the Sixth Amendment right to counsel extends to crimes "factually related" to a charged offense.  See Texas v. Cobb, 532 U.S. 162, 168 & n.1; see also United States v. Dixon, 409 U.S. 688, 704 (1993); United States v. Mills, 412 F.3d 325, 329 & n.1 (2d Cir. 2005).

The Sixth Amendment does not prevent the government from investigating individuals who have been charged with an offense.  The government has a valid interest in investigating new and additional crimes.  "[T]o exclude evidence pertaining to charges as to which the Sixth Amendment right to counsel had not attached at the time the evidence was obtained, simply because other charges were pending at the time, would unnecessarily frustrate the public's interest in the investigation of criminal activities."  Maine v. Moulton, 474 U.S. 159, 179-80 (1985).  Although incriminating statements pertaining to pending charges are inadmissible at trial on those charges regardless of whether the government obtained the statements while investigating additional crimes, incriminating statements relating to crimes for which the Sixth Amendment has

crimes charged in Counts 18, 19, 20, and 21.  They are also not unfairly prejudicial, and the defense does not argue as such.

not attached are admissible.  See id. at 180 & n.16; see also McNeil, 501 U.S. at 175-76; DeVillio, 983 F.2d at 1190-92.

Thus, even if CC-1 were a signed-up and paid informant (he was not), any statements made by Adam Kaplan to CC-1 about Counts 18, 19, 20, and 21 in the superseding indictment are admissible.  The defense makes no argument here that those charges in the superseding indictment are not distinct from the charges in the original indictment.  Nor can they.  Under the Blockburger elements test, which applies when considering whether an offense is distinct for Sixth Amendment purposes, each new count requires proof that the charges in the original indictment do not.  See Texas v. Cobb, 532 U.S. 162, 173 (2001).  The test is thus "whether each provision requires proof of a fact which the other does not."  Blockburger v. United States, 284 U.S. 299, 304 (1932).  The defense cites no caselaw suppressing statements about uncharged conduct under Massiah.

Second, regardless, CC-1 was not a government informant and was not acting on behalf of the government until CC-1 signed a cooperation agreement with the government on December 10, 2024.  The cases cited by the defense do not hold otherwise.  In fact, in this section of their brief ("CC-1 Acted as an Agent for the Government Throughout the Relevant Period"), the defense cites only three cases, each of which are inapposite and are addressed as follows:

The defense cites United States v. Pannell, 510 F. Supp. 2d 185 (E.D.N.Y. 2007) for the proposition that "[t]he Supreme Court has made clear that certain government conduct is tantamount to sponsorship of further investigation, even where the government explicitly instructs the informant to cease all questioning of the defendant."  But the defense ignores that in Pannell, the government informant was a formal cooperator – an individual who had signed a cooperation agreement with the government.  Id. at 187.

16

In fact, in its discussion of the <u>Massiah</u> analysis, the district court was clear that "[t]he first inquiry" in a <u>Massiah</u> analysis is "whether the informant acted as a government agent when he obtained information from the defendant." <u>Id.</u>  As stated by the district court:

> The Second Circuit has held that an informant becomes a government agent "only when the informant has been instructed by the police to get information about the particular defendant." <u>United States v. Birbal</u>, 113 F.3d 342, 346 (2d Cir.1997).  Because "[t]he <u>Massiah</u> rule covers only those statements obtained as a result of an intentional effort <u>on the part of the government</u> [,] ... information gotten before the inmates became agents/informants is not protected by the rule." [<u>United States v.</u>] <u>Stevens</u>, 83 F.3d [60,] 64 (2d Cir.1996) (emphasis in original).

<u>United States v. Pannell</u>, 510 F. Supp. 2d 185, 189 (E.D.N.Y. 2007).

Those Second-Circuit cases cited by the <u>Pannell</u> court are equally clear.  In <u>Birbal</u>, the informant, who was in jail with Birbal, had already agreed with the government to provide "any and all information in his possession relating directly or indirectly to any and all criminal activities or other matters of which he has knowledge," but had not been enlisted to seek out information from Birbal.  The Second Circuit held that the informant was not a "government informant" because the government had not asked the informant to elicit the information.  <u>Birbal</u>, 113 F.3d at 346.  In <u>Stevens</u>, the Second Circuit held that "to treat every inmate who hopes to cut some future deal as a 'government informant' is to extend the idea behind <u>Massiah</u> far beyond its natural reach, and that we are not willing to do."  <u>Stevens</u>, 83 F.3d at 64.

The defense next cites <u>United States v. Henry</u>, 447 U.S. 264 (1980).  There, the Court found that the informant was an inmate who, prior to meeting with the defendant, had been engaged as a paid informant.  <u>Id.</u> at 266.  Law enforcement had specifically told the informant to "be alert to any statements made by the federal prisoners" around him.  <u>Id.</u>  And the informant was paid for furnishing the information.  <u>Id.</u>  None of that is present here – CC-1 was not a paid informant and was not paid for providing any information from Adam Kaplan.

Next, the defense cites <u>Smith v. Fischer</u>, 957 F. Supp. 2d 418, 438-39 (S.D.N.Y. 2013), where the defendant petitioned for habeas corpus under 28 U.S.C. § 2254.[5]  But in <u>Smith</u>, the informant had "agreed to testify for the prosecution before deliberately eliciting at least the second two library conversations" from the defendant.  <u>Id.</u> at 437.  Here, CC-1 had not agreed to testify for the government until months after his interactions with Adam Kaplan; CC-1 signed a cooperation agreement with the government on December 10, 2024.

What the cases cited by the defendant (and the caselaw generally) show is that interactions between government informants and <u>incarcerated</u> defendants are looked at more closely by courts than those interactions with defendants who are not incarcerated.  In <u>Panell</u>, <u>Henry</u>, <u>Smith</u> (and <u>Birbal</u>, and <u>Stevens</u> for that matter), the defendants were incarcerated.  In their initial briefing and renewed motion, the defense repeatedly mentions that the government "must have known that such propinquity likely would lead" to the result of eliciting information from the represented defendant.  <u>See</u>, <u>e.g.</u>, A. Mot. at 7, 8.  But those cases are clear that "such propinquity" is due to the "accused is in the company of a fellow inmate who is acting by prearrangement as a

---

[5]    The defense does not note in their briefing that <u>Smith</u> was a claim for habeas, and that the district court was reversed by the Second Circuit, which held, as to the potential <u>Massiah</u> issue that:

> [The defendant's] trial counsel could have reasonably determined that, based on [the informant's] testimony outside the presence of the jury and the prosecutor's representations, [the informant] was not acting as a government agent when he elicited incriminating statements from [the defendant].  If so, moving to suppress these statements at the time could reasonably have been viewed as baseless.  Even if we thought counsel's choice was <u>not</u> reasonable, we cannot say that it was unreasonable for the State Court to take the contrary view.

<u>Fischer v. Smith</u>, 780 F.3d 556, 561–62 (2d Cir. 2015).

Government agent" (Henry at 273) and the "powerful psychological inducements to reach for aid when a person is in confinement" (Id. at 274).

That is not the case here. Throughout the period that Adam Kaplan communicated with CC-1, he was not incarcerated. In fact, when Adam Kaplan first interacted with CC-1, he was not even indicted. But post-April 2024, Adam Kaplan was free on bond, there were no "powerful psychological inducements to reach for aid", and there was no "fellow inmate". Adam Kaplan was operating freely, as was CC-1. The defense does not cite a single case that an individual was acting as a government agent when that individual did not have a formal agreement with the government or was not being paid by the government. And the defense does not cite a single case that the government "should have known that such propinquity likely would lead to that result" in cases where a defendant was not incarcerated. This Court should not adopt the defendant's newly imposed rules.[6]

Because CC-1 was not a government agent, any statements that Adam Kaplan made to CC-1 are admissible, including statements about paying advisory victims back, creating fraudulent account information, and defrauding additional victims. CC-1 was free to interact with Adam Kaplan as he pleased. Other than one recorded call, the government did not attempt to elicit testimony from Adam Kaplan through CC-1.[7] Adam Kaplan freely made statements and

---

[6]      The defense also argues that Adam Kaplan was "particularly susceptible to the ploys of undercover government agents" because of the "relationship of trust" between Adam Kaplan and CC-1. A. Mot. At 8-9. For the reasons stated above, CC-1 was not a government agent, and the defense cites no cases holding otherwise. Additionally, there is a vast amount of evidence in the record that CC-1 and Adam Kaplan both routinely defrauded each other and lied to each other.

[7]      As stated in the government's opposition to the defendants' pretrial motions, the May 2024 recorded call, which was made at the direction of law enforcement, was regarding an ongoing bank fraud, which was an ongoing, not a charged crime. Immediately before that call, CC-1 was specifically instructed by FBI not to discuss anything relating to the case that Adam

committed crimes while on bond, and the government will seek to introduce those statements and evidence of those crimes through CC-1.[8]

Finally, the defendant's Massiah motion should be dismissed with prejudice.  In a footnote, the defense states that the government has "separately disclosed a Cellebrite report containing thousands of messages between CC-1 and the 2879 Phone during the Relevant Period. Should the government identify any of these messages as an exhibit or otherwise seek to introduce any of these messages into evidence at trial, Mr. Kaplan may need to further renew his motion to suppress to address those messages."  A. Mot. at 5 n.4.  The defendant's argument is without merit.

The conversations between CC-1 and Adam Kaplan were both on CC-1's phone, which was turned over to the defense in May 2025, and on the 2879 Phone, which was seized during Adam Kaplan's second arrest, which the defense moved to suppress, and which the government produced as Rule 16 discovery in October 2024.[9]  It should be clear to the defense at

---

Kaplan was arrested for. And shortly after that call, the government specifically instructed CC-1 that CC-1 was not working for the government and did not instruct CC-1 to take any steps to gather information or elicit statements from Adam Kaplan.

[8]    To note, the defense argues that CC-1 "deliberately elicited" statements by Adam Kaplan.  Again, because CC-1 was not government agent, he was free to interact with Adam Kaplan.  The government writes to correct one statement in the defense's briefing – that CC-1 "messaged with the 2879 Phone on a near daily basis during the Relevant Period, discussing, often at CC-1's prompting, how to handle investment advisory clients who had questions about their accounts and were seeking disbursements of funds."  (A. Mot. At 10).  To be clear, the evidence will show that CC-1 was acting on Adam Kaplan's behalf, and under Adam Kaplan's direction, during this period.

[9]    The defense states that the recording between Adam Kaplan and CC-1 from May 2024 "is still inaccessible to the defense".  A. Mot. at 4.  And the defense states that although they requested the recording, the government "did not respond to our request until this afternoon[.]" Id. at 5.  However, this recording was produced as Rule 16 discovery to the defense in September 2024, stamped, and labeled in a folder as "[CC-1]_ADAM KAPLAN_5-7-24".  The defense did not raise the issue of the recording or their inability to access it until last week.

this point that, regarding the 2879 Phone, the government intends to introduce as evidence: (1) the 2879 Phone itself; (2) that the 2879 Phone was found in Adam Kaplan's home during his arrest; and (3) all the contents of the 2879 Phone, including the conversations between Adam Kaplan and CC-1.  It is unclear why the defense states that Adam Kaplan "may need to further renew his motion to suppress to address those messages" between CC-1 and Adam Kaplan.  Those messages are squarely at issue here.

The defense also states that the "parties are still 'talking in a vacuum[.]'" And the defense states, despite having the entire set of written communications between Adam Kaplan and CC-1, that it is "premature to file an exhaustive <u>Massiah</u> motion."  There is no reason that the defense could not review the written communications between CC-1 and Adam Kaplan, which it has had in its possession for many months and make an "exhaustive" <u>Massiah</u> motion.  This motion should be dismissed without leave to renew for a third time.  If there are <u>new</u> communications that the government provides to the defense, the defense can make <u>in limine</u> motions as permitted by this Court's order regarding 3500.

## VII.    The Court Should Admit Evidence of Adam Kaplan's Attempted Obstruction

Adam Kaplan moves to preclude the government from presenting evidence that he solicited CC-1 to "dig up dirt" on the lead prosecutor (the "Prosecutor") in this matter in an attempt to have the Prosecutor removed from the case.  <u>See</u>. A. Mot. at 14.  The government agrees, in part, to the defendant's motion, to the extent that evidence identifying the Prosecutor as a target of the defendant's obstructive conduct could potentially distract the jury in this case and any reference to the Prosecutor should be precluded.  However, the fact that Adam Kaplan attempted to impede the prosecution of his case by targeting one of the prosecutors is an important part of the

obstructive conduct charged in the superseding indictment and its probative value is self-evident.[10] Accordingly, the government should be permitted to introduce evidence of the defendant's efforts in this regard in a way that preserves the probative value while limiting the potential prejudice.

At the outset, Adam Kaplan claims that evidence of his efforts to have the Prosecutor removed from the case by obtaining damaging information against him is irrelevant. A. Mot. at 14. Adam Kaplan is wrong. This evidence is highly relevant as it is part and parcel of the charged obstructive conduct, which included paying off, threatening and attempting to physically harm victims, as well as attempting to bribe a Department of Justice official who he believed could end the investigation into his crimes. See United States v. Clanton, 2024 U.S. Dist. LEXIS 212304 at *24 (E.D.N.Y. November 21, 2024) ("To be relevant, evidence need only tend to prove the government's case, and evidence that adds context and dimension to the government's proof of the charges can have that tendency."); Old Chief, 519 U.S. at 188-89 ("the prosecution with its burden of persuasion needs evidentiary depth to tell a continuous story").

Moreover, the defendant's further effort to hinder the prosecution of his case "arose out of the same transaction or transactions," is "inextricably intertwined" with the evidence establishing his overall efforts to obstruct justice, as charged in the superseding indictment, and is thus direct evidence of those crimes. United States v. Hsu, 669 F.3d 112, 118 (2d. Cir. 2012). Indeed, the evidence is especially probative because it follows a clear pattern to the obstructive conduct where in certain instances Adam Kaplan attempts to pay individuals for their assistance or silence, and in other cases he seeks to harm them, either through threats and intimidation, or in

---

[10]    Alternatively, the evidence is also admissible under Rule 404(b) to establish the defendant's motive and intent to commit obstruction of justice.

this instance, by attempting to "dig up dirt" on the Prosecutor. Thus, the subject evidence is certainly relevant under Rule 401.

With respect to Adam Kaplan's claim that the subject testimony is too prejudicial under Rule 403 (see A. Mot. at 15), this also has no merit as the testimony at issue is far more probative than it is prejudicial. Indeed, the subject conduct is arguably less serious than much of the other evidence of obstruction that the jury will hear during the trial and any concerns of jury distraction or undue prejudice can easily be addressed by limiting the testimony to be non-specific as to the target. Furthermore, precluding CC-1's testimony based solely on the fact that the obstructive conduct was directed at a prosecutor in the case does not present a sufficient basis to deprive the jury of otherwise probative evidence and only serves to reward the defendant for his bad acts. Indeed, the defendant should not be permitted to use his actions first as a sword to impede the prosecution of the case and now as a shield by seeking to preclude that very conduct because disclosure of who he targeted would be too prejudicial. The Court can certainly strike a fair balance that preserves the evidentiary significance of the disputed fact while limiting any inference that the conduct was directed at a member of the prosecution team.

To that end, the government respectfully submits that CC-1 be permitted to testify that Adam Kaplan directed him to "dig up dirt" on a law enforcement official who was involved in the federal grand jury investigation. The general reference to a "law enforcement official" gives the jury no indication that the conduct involved one of the prosecutors in the case, thereby limiting the potential prejudice while still ensuring that the jury is presented with probative evidence related to the defendant's attempted obstruction charges.

VIII.    The Government Does Not Dispute Adam Kaplan's Motion to Preclude Evidence Regarding Potential Travel

Adam Kaplan moves to preclude evidence of his inquiries to CC-1 about CC-1's time living in Costa Rica and Adam Kaplan's comments to CC-1 about "going south." See A. Mot. at 15-16. Adam Kaplan contends that the evidence is "irrelevant" to the charged offenses, and it does not demonstrate "consciousness of guilt." Id. at 16. The government does not dispute Adam Kaplan's motion to preclude this testimony and will not elicit this testimony from CC-1 during direct examination. Accordingly, this issue is moot.

IX.    The Government Does Not Seek to Introduce Evidence of Adam Kaplan's Meeting with President Trump, and Does Not Object to Adam Kaplan's Use of Evidence of CC-1's Criminal History

Adam Kaplan moves to preclude the government from introducing evidence of a purported meeting between Adam Kaplan and President Trump. See A. Mot. at 17. The government does not object to this request and has no interest in presenting evidence regarding the defendant's claim that such a meeting actually took place.

Adam Kaplan reserves the right to cross-examine CC-1 on his prior convictions, including convictions that are more than 10 years old. See A. Mot. at 19-21. The government has no objection to the defendant cross-examining CC-1 on any of his prior convictions.

X.    Adam and Daniel Kaplan's Motions Regarding the Exclusion of Evidence Pursuant to Federal Rules of Evidence 401 And 403 Are Non-Issues and/or Meritless

A.    Kaplan Unlimited

Daniel Kaplan moves in limine to preclude the government from introducing "evidence as to 'Kaplan Unlimited,' the independent registered investment advisor owned and operated by Adam and Daniel's father." D. Mot. at 16. The government does not seek to introduce any detailed evidence through witness testimony, or otherwise, of Kaplan Unlimited, except that victims may testify that they continued using the defendants as investment advisors through several

24

different institutions, including Kaplan Unlimited. Those limited references are in no way prejudicial or confusing.

B.    Reference to "Kaplans"

The government has no intention of referring to the defendants as the "Kaplans", and the government will repeatedly elicit testimony from victim witnesses that will state that they believe that either Adam Kaplan or Daniel Kaplan (or sometimes both) defrauded them. However, as explained above, Daniel Kaplan and Adam Kaplan are charged in a conspiracy and under Title 18, United States Code, Section 2. The government will argue to the jury that Daniel Kaplan and Adam Kaplan worked together to steal money from victims. The government will introduce evidence that even when, for example, Adam Kaplan lied, Daniel Kaplan still took steps to steal money from certain victims, including those that may not have spoken to him. Daniel Kaplan is free to cross examine victims about their interactions (or lack of interactions) with Daniel Kaplan, and free to argue to the jury that Daniel Kaplan played no role in this conspiracy.[11] Daniel Kaplan does not cite a single case that states that documentary evidence that is authenticated from a source cannot be introduced without 100% certainty about who wrote the substance of the document – especially when there is no argument that one of two individuals charged in a conspiracy wrote the document.

---

[11]    The evidence will show that Daniel Kaplan and Adam Kaplan used their identical nature to promote themselves to victims and repeatedly informed victims that they were a team and worked together. In sending their "bio" to IHT, they stated that they "are identical twins who serve together as a team". They often sent emails from "Adam & Daniel" and "Daniel & Adam", and they often interchangeably interacted with victims. The defendants cannot use their identical nature, and the fact that they committed this scheme across state lines by email and phone, as a sword to protect themselves.

C.    Victim Testimony

Daniel Kaplan seems to argue that for the government to present its case as it wishes, it must charge the defendants with a wire fraud count for each victim that it intends to call:

> The Court should not permit the government to present testimony from all eleven of the additional alleged Advisory Victims on the government's preliminary witness list. Unlike the substantive wire fraud counts, Counts Two through Eleven, where the government must prove allegations that the Kaplans defrauded a particular person in a particular manner, the government need not prove that any particular person or any specific number of people were allegedly defrauded in Counts One and Twelve.

> D. Mot. at 19.

That is not the case. The government may present the case as is necessary to prove the defendants' guilt. And the government does not go through the burden of preparing witnesses, gathering documents, and presenting evidence for no reason. Each witness is on the government's witness list because each witness separately assists in the presentation of the government's evidence. For example, certain witnesses assist in proving the defendants' guilt beyond a reasonable doubt regarding: (1) certain wire fraud counts; (2) venue; (3) that Daniel Kaplan took an active role in the fraud conspiracy; (4) that Adam Kaplan took an active role in the fraud conspiracy; (5) the substantive money-laundering counts; (6) the money-laundering conspiracy (7) the additional fraud scheme; (8) the cover-up that Daniel Kaplan played a role in; and (9) the cover-up and obstruction that Adam Kaplan undertook. Furthermore, regarding the wire fraud conspiracy in Count One, the government plans to elicit testimony regarding the actions alleged in the superseding indictment, including fraudulently overbilling advisory fees (through both lies and forgeries), and misappropriation from bank accounts, through lies about fees and investments. Moreover, the government will prove beyond a reasonable doubt that the defendants also stole

from their victims through lines of credit and concealed their scheme through Ponzi-style payments.

On several occasions, the defendants have noted the complexity of the case and the many (21) counts charged in the superseding indictment. Daniel Kaplan cites cases that state that evidence is cumulative if it "replicates" other evidence. Each victim-witness's story does not "replicate" another victim-witness. Each act taken by Daniel Kaplan and Adam Kaplan that was done to steal money from a separate victim is a separate act in furtherance of their conspiracy. Looking at the evidence in any detail, or at any level of granularity, fraud against one victim does not "replicate" fraud against a separate victim. Moreover, the defendants stole from their victims in numerous ways, and the government is permitted to provide evidence as to each one. The government is entitled to prove its case. See, e.g., Old Chief.

Of course, the defendants will be "prejudiced" by the testimony that the government will produce at trial in that all evidence that is probative is "prejudicial". The question here is whether the evidence is unfairly prejudicial. Daniel Kaplan's motion does not identify any reason why calling the victims on the government's witness list would be "unfairly" prejudicial.

D.    Daniel Kaplan's Assets

Daniel Kaplan moves to preclude the government from admitting evidence of the defendant's "wealth and income, including his salary at IHT" claiming that such evidence is "irrelevant to the charged conduct." D. Mot. at 20. Specifically, Daniel Kaplan contends that admission of his "inheritances from family members and dividends from investments[,]" as well as his IHT salary, would be "unduly prejudicial under Fed. R. Evid. 403 and risks igniting juror bias against wealthy financial services executives." Id. The government does not intend to introduce evidence of Daniel Kaplan's assets outside of those acquired as a result of the conduct alleged in the superseding indictment.

27

However, the government does intend to offer evidence of the defendant's financial activity while at IHT at trial because such evidence is directly relevant and highly probative of the crimes charged.  The defendant is charged with, among other things, conspiracy to commit wire fraud and a money laundering conspiracy in connection with his role in defrauding investors while at IHT.  Daniel Kaplan and his brother charged excessive advisory fees, and funneled money direct from their investors' accounts into the defendants' personal bank accounts.  To establish that the defendant controlled his clients' accounts and show that investor funds were not used for their intended purpose, the government intends to introduce evidence at trial showing how the money in the investor accounts was used, including evidence of how the defendant benefitted personally from the funds in the accounts.

For example, the government intends to present evidence at trial showing how the investors' money flowed into bank accounts controlled by the defendant, and, in some cases, flowed directly from the clients' accounts to vendors selling luxury items.  This evidence of defendant's spending is not offered to call attention to his wealth; rather, it is direct evidence of his participation in the fraud and the way he used the proceeds from the scheme.

Courts in the Second Circuit routinely find wealth and spending evidence to be "highly probative" and admissible in this context.  United States v. Hoey, 725 F. App'x 58, 61 (2d Cir. 2018) (affirming district court's admission of personal spending evidence because the defendant's "spending habits coupled with the depletion of the Company's funds due to financial struggles was highly probative of [his] motive for taking money from the Plan"); United States v. Motovich, No. 21-CR-497 (WFK), 2024 WL 2943960, at *2 (E.D.N.Y. June 11, 2024) (evidence of spending admissible "as both direct and motive evidence of Defendant's alleged offenses, demonstrating (1) Defendant's control over the accounts through which he allegedly laundered the

proceeds of his money transmitting business and (2) the benefits he received personally from the funds in the accounts" (internal quotations omitted)); United States v. Runner, No. 18-CR-0578 (JS), 2023 WL 3092915, at *4 (E.D.N.Y. Apr. 26, 2023) (wealth evidence is admissible when "Defendant's lifestyle was 'funded by victim payments to the indicted scheme'"); United States v. James, 607 F. Supp. 3d 246, 264 (E.D.N.Y. 2022) (evidence of wealth is "relevant to Defendant's motive to commit the fraud, identity theft, and money laundering charges here").

Further, the defendant's funneling of funds from his victims' accounts is particularly probative here as the government expects the defendant will argue at trial that he was unaware of the fraudulent activity. Accordingly, the moving of funds to the defendant's personal account will serve to rebut any argument that he was not a participant in or was somehow unaware of the scheme. Moreover, evidence that the defendant purchased, for example, luxury items with funds from a victim's investment account discredits any claim that he had a good faith belief that he was properly investing his clients' money. See United States v. Hoey, 725 F. App'x 58, 61 (2d Cir. 2018) (personal spending evidence admissible because it "was used to rebut [the defendant's] defense that he had a good faith belief that the money he took was being used for the benefit of the Plan beneficiaries").

In sum, the defendant cannot engineer a multi-million-dollar fraud scheme, hide his involvement in that offense, funnel a significant amount of money into his personal bank account, and then claim that calling attention to his assets while at IHT is somehow improper.

E.    Harm to Well-Being

Daniel Kaplan moves to preclude victim testimony regarding the effect that Adam Kaplan and Daniel Kaplan's crimes had on victims' mental health and well-being. See D. Mot. at 21. Although the government does not intend to elicit testimony from victims regarding significant mental health issues or emotional trauma they may have suffered as a result, for the victims who

believed that they shared a close personal connection with Adam Kaplan and/or Daniel Kaplan, limited testimony regarding the personal impact that the defendants' crimes had on them is essential to demonstrate how deeply those victims trusted the defendants and how Adam Kaplan and Daniel Kaplan were able to use that trust as a cornerstone of the entire fraudulent scheme.

The evidence at trial will establish the many ways that the defendants manipulated their victims in furtherance of their crimes. Most significantly, Adam and Daniel Kaplan's crimes were often facilitated by the fact that the victims saw the defendants as loyal and trusted friends and had complete faith in them as financial advisors. The defendants insidiously cultivated this trust and faith, using it as the foundation that allowed them to steal as much money as they could for as long as they did. There are victims who will testify that the trust they had in Adam and/or Daniel Kaplan was the reason why they did not closely monitor their accounts or question what they were told when they did raise concerns. It is also why several of the victims continued to use the defendants as their financial advisors even after learning that they had been fired from ML and IHT. And when the realization of the defendants' betrayal did set in, the victims' long held trust in the defendants was replaced by feelings of, inter alia, shock, confusion, anger and sadness. Adam and Daniel Kaplan's ability to manipulate the victims in this case is clearly evidenced by the significant personal impact they experienced in the aftermath of the defendants' crimes. Thus, the emotional impact on the victims is important evidence establishing how deeply they trusted the defendants and is extremely probative to demonstrate Adam and Daniel Kaplan's success at building this all-important aspect of the fraud.

Furthermore, to the extent that Adam and Daniel Kaplan will seek to attack the victims' credibility at trial by cross-examining them as to some purported bias or motive to lie, testimony regarding the witnesses' reaction to the defendants' fraudulent activities is certainly

probative to undermine that line of questioning.  Indeed, the significant personal impact the victims experienced from having people they trusted take advantage of them further shows the strong connection they had with Adam and/or Daniel Kaplan and is relevant to offset any claim that their cooperation with the investigation is being driven by financial opportunity or some other self-serving motive.  Moreover, the victims' feelings and reactions to the defendants' crimes are also relevant to prove that they did not author certain emails or other written communications that were forged and fraudulently used by Adam and Daniel Kaplan to conceal their crimes.

 F. <u>Ponzi Evidence</u>

  Daniel Kaplan moves to preclude the government from eliciting testimony or making arguments that Daniel and Adam Kaplan engaged in a "Ponzi scheme" or made "Ponzi-like" payments to victims.  <u>See</u> D. Mot. at 22.  As an initial matter, the government will not make any reference to those terms during its opening statement, nor will it elicit them during direct testimony of its witnesses.  However, the evidence will establish that the defendants' scheme involved numerous instances when money stolen from one victim was used to pay another victim in order to conceal and continue the fraud.  The government reserves the right to make any and all arguments supported by the evidence and opposes the defendant's motion to the extent that it seeks to preclude the government from using terms or phrases that are fair argument based on the evidence.

  Adam Kaplan moves to preclude the government from using the term "Ponzi scheme" or other "similar pejorative terms" in its opening statement.  <u>See</u> A. Mot. at 18.  The government will not make reference to a "Ponzi scheme" during its opening statement.  With respect to other "pejorative" terms, the government is fully aware of and will comply with the rules governing opening statements.

XI.  **The Court Should Permit the Government's Summary Witness to Hear Other Witnesses at Trial**

Daniel Kaplan moves to sequester witnesses from the courtroom during other witnesses' testimony pursuant to Federal Rule of Evidence 615 ("Rule 615").  D. Mot. at 22.  The government does not dispute that the Court should exclude witnesses so that they cannot hear other witnesses' testimony, but requests that the Court permit its summary witness, forensic accountant at the Federal Bureau of Investigation ("FBI"), ███████ to listen to other witnesses' testimony as Rule 615 permits exceptions for "an officer or employee of a party that is not a natural person, after being designated as the party's representative by its attorney."  Fed. R. Evid. 615(b).

Specifically, "the legislative history of Rule 615 makes it clear that a governmental investigative agent, even though he is also a witness, may be designated to sit at the Government counsel's table."   United States v. Perry, 643 F.2d 38, 53 (2d Cir. 1981) United States v. Rivera, 971 F.2d 876, 889 (2d Cir. 1992) (citing United States v. Pellegrino, 470 F.2d 1205, 1208 (2d Cir. 1972)); see also United States v. Parodi, 703 F.2d 768, 774 (4th Cir. 1983) (summary witness who observed the trial prior to his testimony was allowed to testify as to certain telephone records since the records did not go beyond what was obvious in the records themselves, as those records had been proven and testified to by other witnesses in the case).

███████ is expected to use a hybrid of methods to trace funds invested, deposited, and withdrawn pertinent to the allegations in the superseding indictment.  ███████ will also use summary charts during his testimony to facilitate the presentation of financial evidence. As such, in order to better synthesize the financial records, ███████ should be permitted in the courtroom to see the exhibits presented and hear the witnesses on trial; otherwise, he will be relying on hearsay.  Allowing ███████ in the courtroom would thus be more efficient, and would be consistent with the findings of numerous courts that summary witnesses fall within the exception

articulated in Rule 615(3).  See e.g., United States v. Lussier, 929 F.2d 25, 30 (1st Cir. 1991) (case

agent who was summary witness allowed to remain in courtroom); United States v. Stierhoff, 549

F.3d 19 (1st Cir. 2008) (summary testimony of revenue agent "fits comfortably within the mine-

run of permissible summary witness testimony in tax cases.").  The government has not requested

that ██████ sit at the prosecution table.

CONCLUSION

For the reasons set forth above, the government respectfully submits that the

Court should deny the defendants' motions their entirety.

Dated: Central Islip, New York
   August 25, 2025

          Respectfully submitted,

          JOSEPH NOCELLA, JR.,
          United States Attorney
          Eastern District of New York

      By:  /s/_____
        Adam R. Toporovsky
        Paul G. Scotti
        Rebecca M. Urquiola
        Assistant United States Attorneys
        (631) 715-7900

CC: Clerk of the Court (JMA)
   Defense Counsel (by ECF)