# Exhibit C

# ECF No. 131 - Redacted

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

_____

UNITED STATES OF AMERICA,                    Index No.: 2:23-CR-0293 (JMA) (JMW)

-v-                                          ORAL ARGUMENT REQUESTED

ADAM KAPLAN and DANIEL KAPLAN

Defendants.

_____

## MEMORANDUM OF LAW IN SUPPORT OF
## MOTION TO RELEASE ADAM KAPLAN PENDING TRIAL
## ON CONDITIONS

November 18, 2024

Eric M. Creizman
Christina O. Gotsis
Morrison Cohen LLP
909 Third Avenue, Fl. 27
New York, New York 10022
Tel. (212) 735-8640
ecreizman@morrisoncohen.com
cgotsis@morrisoncohen.com
*Attorneys for Adam Kaplan*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES……………………………………………………………..iii

PRELIMINARY STATEMENT ................................................................. 1

THE PROPOSED CONDITIONS OF PRETRIAL RELEASE ................................................. 7

STATEMENT OF FACTS ................................................................. 8

    I.    Personal, Educational, and Career History and Characteristics........................................ 8

    II.    Mr. Kaplan's Medical Conditions............................................................. 10

    III.    Relevant Procedural History ............................................................. 13

ARGUMENT ................................................................. 15

    I.    Legal Standard. ................................................................. 15

        A.    The law strongly favors pretrial release for defendants charged with non-violent offenses. ................................................................. 15

        B.    Bail may be revoked only if the Court finds there are no set of conditions that will assure the defendant's appearance or the safety of the community, or if it finds that the defendant is unlikely to abide by any conditions of release. ................................................ 16

    II.    The proposed conditions of release reasonably assure the safety of the community. ...... 17

        A.    The factors under Section 3142(g) do not support a finding that Mr. Kaplan poses an unmitigated risk of dangerousness. ................................................................. 17

        B.    Detention for obstruction of justice is unwarranted here............................................. 19

        C.    Any risk of obstructive conduct is reasonably mitigated by the Proposed Conditions of Release. ................................................................. 19

    III.    The Proposed Conditions of Release reasonably assure Mr. Kaplan's appearance. .... 21

        A.    Mr. Kaplan is not a flight risk. ................................................................. 21

B.    Any risk of flight is reasonably mitigated by the Proposed Conditions of Release. .... 22

IV.    Mr. Kaplan will abide by the conditions of release. ....................................................... 23

V.    Compelling reasons warrant Mr. Kaplan's release pending trial...................................... 23

A.    The deplorable conditions at MDC Brooklyn and Mr. Kaplan's chronic medical conditions are circumstances that independently, and in combination, constitute "compelling reasons" warranting release on the Proposed Conditions of Release. ............ 24

1.    The harsh realities of incarceration at MDC Brooklyn.............................................. 24

2.    The MDC cannot adequately treat Mr. Kaplan's chronic conditions. ...................... 26

B.    Temporary release pending trial is warranted so that Mr. Kaplan can meaningfully participate and assist counsel in his defense. ....................................................................... 29

CONCLUSION...................................................................................................................... 32

# TABLE OF AUTHORITIES

## CASES

*Barker v. Wingo,* 407 U.S. 514, 532 (1972) ................................................................ 29,30

*United States v. Bodmer,* 2004 WL 169790 (S.D.N.Y. Jan. 28, 2004)....................................... 29,30

*United States v. Campos*, 2019 WL 7049953, (E.D.N.Y. Dec. 23, 2023).................................. 19

*United States v. Chavez*, 710 F.Supp.3d 227 (S.D.N.Y. 2024)....................................... 24,25,28,29

*United States v. Colucci*, --F.Supp.3d--, 2024 WL 3643857 (E.D.N.Y. Aug. 5, 2024) .......... 24,25

*United States v. Dabidah*, 2024 WL 4627639 (S.D.N.Y. Oct. 30, 2024).................................... 18

*United States v. Danilovich*, 1:12-CR-171-JPO (S.D.N.Y) ................................................ 21

*United States v. Desmond,* 2023 WL 4052415 (W.D. Wash. June 16, 2023) .......................... 23

*United States v. Dreier*, 596 F.Supp.2d 831 (S.D.N.Y. 2009)........................................ 17,20

*United States v. Esposito*, 309 F.Supp.3d 24 (S.D.N.Y. 2018)........................................ 20

*United States v. Griffin*, 2024 WL 2891686 (E.D.N.Y. Jun. 10, 2024)................................... 24

*United States v. Himler*, 797 F.2d 156, 159 (3d Cir. 1986) ............................................... 17

*United States v. Hunter*, 2020 WL 2537579 (D.N.J. May 19, 2020) ................................... 16

*United States v. Madoff*, 586 F.Supp.2d 240 (S.D.N.Y. 2009)........................................... 19

*United States v. Mercado*, 2024 WL 3082704 (W.D.N.Y. June 20, 2024) ........................... 20

*United States v. Mercedes,* 254 F.3d 433 (2d Cir. 2001)................................................... 17

*United States v. Perez*, 2020 WL 1329225 (S.D.N.Y. Mar. 19, 2020).................................. 26

*United States v. Rodriguez*, 950 F.2d 85 (2d Cir. 1991)................................................... 17

*United States v. Sabhnani*, 529 F.Supp.2d 377 (E.D.N.Y. 2007) ..................................... 17

*United States v. Salerno*, 481 U.S. 739 (1987) .............................................................. 15

*United States v. Shakur*, 817 F.2d 189 (2d Cir. 1987) .................................................... 15

*United States v. Stein*, 2005 WL 3071272 (S.D.N.Y. Nov. 15, 2005)        …        ……30

*United States v. Suazo Nunez*, 2020 WL 1911226 (S.D.N.Y. Apr. 20, 2020)........................... 26

*United States. v. Scarpa*, 815 F.Supp. 88 (E.D.N.Y. 1993)................................................ 18

## STATUTES

18 U.S.C. § 3142(c)(2)........................................................................................ 16

18 U.S.C. § 3142(f)(2)(B)................................................................................... 19

18 U.S.C. § 3142(g) .......................................................................................... 16

18 U.S.C. § 3142(g)(1) ...................................................................................... 18

18 U.S.C. § 3142(g)(2) ...................................................................................... 18

18 U.S.C. § 3148(a) ........................................................................................ 16

18 U.S.C. § 3148(b) ........................................................................................ 16

18 U.S.C. § 3148(b)(2) ................................................................................... 23

18 U.S.C. § 3148(b)(2)(B) .............................................................................. 17

18 U.S.C. 3142(i)(4) ....................................................................................... 23

## OTHER AUTHORITIES

Michael R. Sisak and Michael Balsamo, *Inside the Brooklyn federal jail where Sean 'Diddy' Combs is locked up: Violence, squalor and death*, ASSOCIATED PRESS, Sept. 19, 2024 .......... 24

Chelsea Rose Marcius, U.S. Officials Sweep Troubled Brooklyn Prison Where 2 Were Killed, N.Y. TIMES, Oct. 28, 2024 ............................................................................ 2

████████████████████ ............................................................................... 13

████████████████ ...................................................................................... 10

Erin Keller, Feds Investigate 'Troubled' NYC Jail Where Sean 'Diddy' Combs Is Living, NEWSWEEK, Oct. 28, 2024 ....................................................................... 3

Jacqueline Howard, *Asthma can turn deadly in rare cases. Here's How*, CNN HEALTH, Nov. 11, 2019 ...................................................................................... 27

John Annese, *Brooklyn federal jail ignores inmate's lung cancer diagnosis in latest medical mess*, , Jul. 9, 2024 .................................................................... 28

John Annese, *Brooklyn judge calls Sunset Park federal jail an 'abomination; after staff ignore order to send ailing inmate to medical facility*, Dec. 20, 2023, N.Y. DAILY NEWS ................ 24

John Annese, *Judge demands answers from Brooklyn federal jail officials over inmate's medical woes*, May 6, 2024 ......................................................... 28

Lola Fadulu, *Inmate Dies After Fight Breaks Out at Troubled Brooklyn Jail*, N.Y. TIMES, July 17, 2024 ............................................................................ 25

████████████████ ...................................................................................... 10

Michael Stallone and Kelly Hayes, *Inside the Brooklyn federal jail where Diddy is locked up: 'Hell on earth'*, FOX 5 NEW YORK, Sept. 19, 2024 ........................... 25

Rich Schapiro, *Sean Combs' new home—a notorious federal jail—has a 'way of breaking people,' lawyers say*, NBC NEWS, Sept. 18, 2024 ................................. 25

Robert Abruzzi, *Brooklyn's MDC jail stops accepting sentenced inmates amid concerns over 'barbaric conditions'*, BROOKLYN DAILY EAGLE. Sept. 17, 2024 ............................ 26

U.S. Dep't of Justice, OIG Report, *Review of the Federal Bureau of Prisons' Medical Staffing Challenges*, Mar. 2016 ................................................... 27

Walter Pavlo, *Federal Bureau of Prisons' Medical Care Falls Short of its Own Policy*, FORBES, Apr. 19, 2022 ............................................................... 27

Adam Kaplan, by his attorneys, moves for release pending trial under 18 U.S.C. § 3148(b)(2) on the ground that a combination of conditions, as set forth below, can reasonably assure that Mr. Kaplan will not flee or pose a danger to the community.[1]

**PRELIMINARY STATEMENT**

Adam Kaplan has been incarcerated for 69 days inside MDC Brooklyn.  His experience there has been frightening, bewildering, and sobering.  Since he was remanded, Mr. Kaplan has been confined to his cell for over 85% of the time.  In addition, Mr. Kaplan's exposure to



has exacerbated his ███ and caused a ████████████████████. ██████████ ████████████████████████████████████ ████████████████████████████████████ ██████████ Mr. Kaplan's harrowing experience at the MDC is a powerful disincentive against any future violations of pretrial release conditions.

Mr. Kaplan has experienced first-hand the dreadful conditions at the MDC that the media and courts in this Circuit have routinely decried for many years.  He is confined to his cell every day from 9 p.m. to 8 a.m., and if not meeting with counsel, for two additional hours during the daily count on weekdays, and for even two more hours on weekends and on holidays during a secondary count.  Additionally, unscheduled days' and weeks' long lockdowns occur frequently due to searches for and discovery of contraband and brawls between inmates.  In fact, Mr.

---

[1] In this memorandum, we do not contest the merits of the factual allegations set forth in the Iannuzzi Affidavit for two principal reasons: *first*, the defense is still conducting its own investigation of the allegations; *second*, as the government has stated in open court, it is seeking a superseding indictment that will include charges based on the allegations in the Iannuzzi affidavit, and accordingly, the defense will be prejudiced by having to present a defense to those charges before trial.

Kaplan's unit has been on lockdown since Sunday, November 10—the unit's second prolonged lockdown in two weeks.[2]

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████    Mr. Kaplan has not been outdoors for the entire time he has been incarcerated, and the windows in his unit are all blocked by crude obstructions, depriving him of any sunlight for over two months.  The only exercise he is afforded is walking around the unit.  The conditions in Mr. Kaplan's unit and his cell are alarmingly unsanitary: mice and rats roam the floor; toilets often overflow or don't flush properly or even flush at all; mold is ubiquitous; and █████████████████████████████████.

The week of Monday, October 28 to Monday, November 4 was the most unbearable Mr. Kaplan has faced to date.  On October 28, the Justice Department launched an "interagency operation" involving agents from the Bureau of Prisons and the Office of the Inspector General purportedly "designed to achieve [the agencies'] . . .. shared goal of maintaining a safe environment for both our employees and the incarcerated individuals housed at MDC Brooklyn."[3]  Thus far, however, the operation has only made things worse and more dangerous for inmates, including Mr. Kaplan.

---

[2] Although Mr. Kaplan had a brief respite from the current lockdown on Friday, November 15 to use the computer and to meet his parents, he has been warned that his unit is likely to remain under lockdown for several days next week.  According to a memorandum to all inmates in Mr. Kaplan's unit from Captain C. Haines dated November 12, Mr. Kaplan's unit "will remain secured for the near future" because staff is investigating "a serious incident that resulted in an injury to an inmate."  Declaration of Eric M. Creizman, dated Nov. 11, 2024 ("Creizman Decl."), Ex. 1.

[3] See, e.g., Chelsea Rose Marcius, U.S. Officials Sweep Troubled Brooklyn Prison Where 2 Were Killed, N.Y. TIMES, Oct. 28, 2024, available at

On October 28, Mr. Kaplan was roused at 5 a.m. by the jarring sound of approximately 200 officers from the interagency force dressed in fatigues marching from cell to cell and barking orders to "get on the floor!"  Mr. Kaplan jumped from his top bunk and stood at attention, ████████████████████████████████████████████ The Green Team agents conducted a strip search of Mr. Kaplan and his cellmate, and ordered them to leave their cell barefoot, wearing only their underwear.  All inmates in the unit were similarly undressed and ordered to line up against the wall with their hands on their heads.  The inmates were then handcuffed, led through a full body scanner, with each inmate accompanied by two Green Team agents, and brought to Unit 73, an MDC unit that had been vacant for the last two years.  Unit 73 was dirty and dusty with black mold growing on the walls, causing Mr. Kaplan to ████████████████████████████████████████.

After arriving in Unit 73, Mr. Kaplan and the other inhabitants of his unit were locked in cells without running water or toilet paper.  Hours later, Green Team officers began leading each handcuffed inmate to the unit office to interrogate him as to whether he possessed or knew about anyone possessing drugs, firearms, or other contraband.  No food was provided to the inmates until mid-afternoon, when the Green Team agents served the inmates trays containing dry cereal and a carton of milk without utensils.  According to the Green Team agents, the MDC kitchen was closed.  Mr. Kaplan, like all the other inmates, had to eat from their bowls like household pets.  Because Mr. Kaplan is ████████████████, he was unable to drink the milk and thus went hours without any hydration.  When Mr. Kaplan tried to hand his tray with the milk to a Green

---

https://www.nytimes.com/2024/10/28/nyregion/doj-mdc-brooklyn-prison.html; See also, e.g., Erin Keller, Feds Investigate 'Troubled' NYC Jail Where Sean 'Diddy' Combs Is Living, NEWSWEEK, Oct. 28, 2024, available at https://www.newsweek.com/sean-combs-diddy-nyc-jail-feds-investigation-1975926.

Team agent, ███████████████████████████. As the day went on, having no

working toilet to use, inmates began to urinate and defecate on the floor.

After the interrogations, Mr. Kaplan and the other inmates were led handcuffed back to

their cells in Unit 83 and were locked inside for the rest of the week. Mr. Kaplan found that his

cell had been turned upside down. His locker was emptied and his belongings were strewn all

over the floor. The food items and Vitamin D that Mr. Kaplan had purchased at the commissary

were confiscated. This was disheartening since Mr. Kaplan had no access to commissary for the

first five weeks he was in custody and was finally given access to essential items only after

counsel had intervened.[4] Mr. Kaplan also discovered that his mattress was missing. Before

bedtime, Mr. Kaplan was provided a thin mattress that was dirty, stained, and reeked of sardines.

Exhausted, Mr. Kaplan slept on the metal bed frame rather than use the soiled mattress.

For the rest of the week, until the following Monday, Mr. Kaplan and the inmates in Unit

83 were locked in their cells all day (save for in person and remote legal visits), and were

allowed out of their cells only on Saturday and Sunday for approximately 30 minutes to an hour

each day. While under lockdown, Mr. Kaplan had no access to the phone or computer. There

also was no running water, so Mr. Kaplan could not wash his hands, brush his teeth, drink water,

or flush his toilet. As a result, Mr. Kaplan and his cellmate, like most inmates in the unit,

covered their cell toilet with a towel and toothpaste to try to suppress the stench. Sanitation

services were suspended and consequently, garbage piled up in the unit, and there were increased

rodent sightings. Although inmates were initially informed that during the pendency of the

interagency operation they would be permitted to take showers in small, controlled groups,[5] the

---

[4] The Vitamin D works as an ████████████████████████████████.

[5] *See* C. Haines, Memorandum for the Inmate Population, Oct. 28, 2024 (Creizman Decl. Ex. 2).

water was not running most of the time, so that promise was not kept.  On the intermittent

occasions when the water was running, it was brown and freezing cold.  Mr. Kaplan managed to

take one shower during the entire week.  Since the kitchen was also closed for the entire week,

Mr. Kaplan and his fellow inmates were served meals consisting only of crackers, a packet of

peanut butter, and two slices of bread.  They were provided one small water bottle per day.[6]

Tensions were high in Unit 83 that week.  During the brief times the inmates were let out

of their cells, brawls erupted over the use of the showers, computers, and phones.  Inmates

robbed each other of the commissary goods that had not been confiscated.  Since Unit 83

resumed normal operations, the conditions have only worsened.  Most alarmingly, both the unit

in general and Mr. Kaplan's cell in particular have been infested with mice and rats.  In an effort

to notify a corrections officer, Mr. Kaplan and his cellmate pressed the emergency help buttons,

but they were not working since before Mr. Kaplan arrived in the unit.  On Saturday night,

November 9, Mr. Kaplan flagged down a corrections officer and requested medical attention for

what he believed were rodent bites on his skin.  He felt that he was running a fever.  The

corrections officer told Mr. Kaplan that no medical staff was onsite and that he would be seen in

about two weeks.  Even after counsel intervened and the MDC promised that Mr. Kaplan would

get medical attention, he did not receive medical attention.  Since the most recent lockdown on

November 10, the rodents are still in his cell and in his unit, his cell toilet overflowed again, the

unsanitary conditions have been ignored by corrections officers, and Mr. Kaplan has yet to be

evaluated by any health care professional.  On Friday, November 15, ███████████████

---

[6] During a meeting with Mr. Kaplan that week, counsel observed that Mr. Kaplan appeared dehydrated and weak, and provided him with beverages and snacks which seemed to improve his condition somewhat.

██████████████████████████████████████████████████████████

████[7].

On September 11, 2024, the Court remanded Mr. Kaplan pending a detention hearing after finding that based on the government's submission, including the affidavit of Special Agent Iannuzzi, there was probable cause to support that he committed crimes on release and clear and convincing evidence that he violated conditions of his pretrial release. Nevertheless, Mr. Kaplan's release is warranted here because the evidence rebuts the presumption that no conditions will reasonably assure the safety of the community. Mr. Kaplan's release on the stringent conditions we propose below will reasonably negate any risk of conceivable danger that Mr. Kaplan may pose to the public. In the alternative, the deplorable conditions of the MDC, the unique harms those conditions pose to Mr. Kaplan's health and physical safety, the need for Mr. Kaplan to obtain competent and regular medical evaluations and treatment, and the need for Mr. Kaplan to meaningfully participate in his defense and collaborate with counsel constitute, both independently and in combination, "compelling reasons" under the Bail Reform Act to warrant his temporary release pending trial in this document-intensive, complex case.

For all these reasons, we respectfully request that the Court order Mr. Kaplan released on the proposed bail conditions set forth below.

---

[7] During a meeting with Mr. Kaplan on November 17, ██████████████████████████████████
████████████████████████████████

## THE PROPOSED CONDITIONS OF PRETRIAL RELEASE

In addition to the standard conditions of pretrial release, the following extraordinary conditions (the "Proposed Release Conditions") are sufficient to reasonably assure Mr. Kaplan's appearance in court, the safety of the community, and the integrity of the judicial process through the conclusion of this case:

• A personal recognizance bond, secured by property, with a number of financially responsible sureties as the Court deems necessary and appropriate. The properties securing Daniel Kaplan's bond, and which previously secured Adam Kaplan's bond—residential properties located at █████████████ and at █████████████████████████ (the "Manhattan Apartment")—are unencumbered (other than by Daniel Kaplan's bond) and are believed to have a total combined market value significantly higher than $5 million.

• Strict home detention with GPS or other location monitoring, at the Manhattan Apartment. Mr. Kaplan must stay at the Manhattan Apartment at all times except for attorney visits, court appearances, medical treatment, religious services, or other activities approved by Pretrial Services, with the exception of medical emergencies. Such activities will be limited to the Southern and Eastern Districts of New York, absent approval by the Court. Each of the foregoing activities must be submitted to Pretrial Services for approval 48 hours in advance of the requested activity.

• Mr. Kaplan will pay the costs of GPS monitoring.

• Travel outside of the Manhattan Apartment for any reason other than the activities listed above and travel outside of the Southern and Eastern Districts of New York shall require the Court's approval.

• Visits to the Manhattan Apartment shall be limited to Mr. Kaplan's parents, brother, sister, and his attorneys and other members of the defense team, medical visits, building maintenance staff, and food delivery persons. Any other visits will require prior approval by Pretrial Services.

• Installation of a camera facing the front door of the Manhattan Apartment, to which Pretrial Services will have access to the real-time feed and recordings to monitor the identity of visitors to the apartment.

• Mr. Kaplan shall be limited to possessing the following electronic device: a single cellular or landline telephone. That device and any other internet-enabled device permitted by the Court shall be subject to electronic monitoring by Pretrial Services.

• Mr. Kaplan shall not access any cellular telephones or other internet-enabled devices belonging to his parents or siblings. All such devices shall be protected by passwords to which Mr. Kaplan does not have access.

7

• The Manhattan Apartment shall be subject to random visits and inspections by Pretrial Services.

• Mr. Kaplan shall abide by all program requirements and instructions provided by Pretrial Services relating to the operation of monitoring technology.  Unless specifically ordered by the Court, Pretrial Services may require use of one of the following or comparable monitoring technology: (i) radio frequency (RF) monitoring; (ii) passive global positioning satellite (GPS) monitoring; (iii) active global positioning satellite (GPS) monitoring (including "hybrid" (active/passive) GPS); and (iv) voice recognition monitoring.

• Mr. Kaplan shall avoid any and all contact, directly or indirectly, with: (i) any of the individuals identified by the government as possible victims of the charged offense in an email from Assistant United States Attorney Adam Toporovsky to Eric Creizman dated December 27, 2023; (ii) any of the individuals referenced as CC-1 (or any of CC-1's family members), Victim-1 through Victim-16, Flower Victim-1 and Flower Victim-2, Florida Victim and Individual-1 and Individual-2 in Special Agent John M. Iannuzzi's affidavit dated September 9, 2024, in support of the government's motion to remand (ECF No. 105), whose identities will be confirmed by the government; and (iii) any other individual identified by the government in writing, except in the presence of counsel.[8]

• Mr. Kaplan shall refrain from receiving any form of compensation whatsoever— including commissions, finder's fees, or advisory fees, and whether as an employee or independent contractor—relating to advising, recommending, or referring any investment or loan to any person or entity.

• Mr. Kaplan shall disclose to Pretrial Services any arrangements from which he presently receives, or presently expects to receive compensation, whether as an employee or as an independent contractor.  Any future employment or independent contractor arrangements shall be approved in advance by Pretrial Services.

## STATEMENT OF FACTS

### I.  Personal, Educational, and Career History and Characteristics

Adam Kaplan was born on ████████ ███, to █████████████████ ██. ████████████████████████. Adam, along with his siblings, were raised in

Roslyn, New York until Adam was six years old, when the family moved to █████████

---

[8] This condition of pretrial release shall not be construed to limit Mr. Kaplan's defense attorneys and their investigators from conducting an appropriate defense investigation.  Moreover, any disputes concerning any individual identified by the government must be raised with the Court.

current home in Great Neck.  For elementary school, Mr. Kaplan attended ██████████

████████████████████.  For high school, Mr. Kaplan graduated from the Birch Wathen

Lenox School, an acclaimed, non-parochial, private prep school on the Upper East Side.  At

Birch Wathen Lenox, Mr. Kaplan received the Bausch & Lomb Honorary Math and Science

Award and Scholarship, which is sponsored by the University of Rochester and recognizes

outstanding academic achievement in math and science by high school juniors.[9]

In 2007, after graduating high school, Mr. Kaplan enrolled at the University of Rochester

where he majored in economics.  He excelled in his studies at Rochester, and was recruited to

participate in an accelerated dual program with the University's Simon Business School.  In

December 2009, after only two-and-a-half years, Mr. Kaplan graduated from Rochester, earning

his bachelor's degree in economics, with distinction.  He also was awarded Magna Cum Laude

honors and was nominated by faculty to the Economics Honor Society, Omicron Delta Epsilon.

After graduating from Rochester, Mr. Kaplan completed a two-year post-baccalaureate program

in science and premedical studies at Harvard.

In approximately 2012, Mr. Kaplan began his career as an insurance consultant and

advisor.  He expanded his general lines insurance consulting business to include, among other

things, general business consulting, tutoring, and college guidance.  Additionally, Mr. Kaplan

served as an insurance broker and consultant at USI Insurance Services.  In 2016, Mr. Kaplan

decided to enter the world of finance, first recruited by Morgan Stanley as a securities broker and

then transitioning to comprehensive financial advising.  Before the SEC brought its enforcement

action, Mr. Kaplan principally resided in Miami Beach, Florida.

---

[9] *See* Bausch & Lomb Science Award Brochure, *available at*
https://pi.bausch.com/globalassets/pdf/Downloads/Consumer/Our-Company/science-award-brochure.pdf.

## II. Mr. Kaplan's Medical Conditions

**A.** ███████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████

█████████████████████████████████████████████████████████

███████████████████████████████████████████████

█████████████████████████████████████████████████

███████████████████████████████████████████████████

█████████████████████████████████████████████████████████

███████████████████████████████████████████████████

████████████████████████████████████████████████████████

█████████████████████████████████████

██████████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████████████████████████

███████████████████████████████████████████████████████

██████████████████████████████████████████████

---

10 ███████████████████████████████████████████████████████
████████████████████████████████
████████████████████████████████████████████

**B.** ████████████████████████████████

---

[12] *See* Letter from Mark J. Mills, JD, MD, to Eric M. Creizman, dated Nov. 8, 2024, with attachments (Creizman Decl. Exs. 4, 4A, 4B, and 4C ) at 1; *see also* Letter from Shahram D. Shamekh, M.D., F.A.C.P., dated Nov. 4, 2024 (Creizman Decl. Ex. 5).

[13] *See* Creizman Decl. Ex. 4 at 2.

[14] Defense counsel requested adjournments of scheduled status conferences to enable Mr. Kaplan ██████████████████████████████ in letters to the Court dated April 8, 2024 (ECF No. 73) and May 20, 2024 (ECF No. 75), both filed electronically under seal.

**C.** ████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████

████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

---

[15] *See* ████████████████████████████, Aug. 20, 2024 (Creizman Decl. Ex. 6).

[16] *See* Dr. Shamekh Nov. 4, 2024 letter (Creizman Decl. Ex. 5) at 1.

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████

    █████████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████████

████████████████████████████████████████████████████████

███████████████████████████████████████████

### III. Relevant Procedural History

On July 25, 2023, a 16-count indictment was unsealed charging Adam Kaplan and Daniel Kaplan with conspiracy to commit wire fraud, wire fraud, investment advisor fraud, and money laundering, all arising out of an alleged scheme to defraud their financial advisory clients.  On the morning of July 25, 2023, FBI agents converged upon the Kaplans' parents' home in Great Neck to arrest them, but Adam and Daniel were not staying there.  Upon learning of the attempted arrest, the Kaplans promptly self-surrendered to the custody of the FBI and were

---

[17] ██████████████████████████████████████████
https://my.clevelandclinic.org/health/diseases/24320-hyperacusis.

[18] *Id.*

[19] *See* Bank of America Merrill Lynch, *Capabilities & Limitations Form*, dated June 5, 2017 (Creizman Decl. Ex. 7).

[20] See Dr. Shamekh Nov. 4, 2024 letter (Creizman Decl. Ex. 5) at 1

arraigned that same day before Magistrate Judge Wicks.  On consent of the parties, Magistrate

Judge Wicks ordered the Kaplans released on personal recognizance bonds in the amount of $2.5

million each, co-signed by two financially responsible sureties (their parents), and secured by

their parents' residence in Great Neck and by the Manhattan Apartment, with conditions

including travel limited to the Eastern and Southern Districts of New York, the surrender of their

passports, and reporting to Pretrial Services as directed.  *See* Order Setting Conditions of

Release, dated July 25, 2023 (ECF No. 15).

On consent of the government and Pretrial Services, the Court granted Mr. Kaplan's

motions to temporarily modify his conditions of release to allow: (1) travel to the District of New

Jersey to attend a family wedding in January 2024 (ECF No. 55); and (2) travel to the Southern

District of Florida from March 6 to March 12, 2024 (ECF No. 64).  On March 5, 2024, the Court

granted Mr. Kaplan's motion, on consent of the government and Pretrial Services, to modify his

conditions of release to expand his travel limits to include the entire State of New York, as well

as the States of New Jersey, Connecticut, and Florida, with advance notice to Pretrial Services.

(ECF No. 66).  Mr. Kaplan has attended every required Court appearance, reported to Pretrial

Services as required, and submitted his monthly supervision reports to Pretrial Services in timely

fashion.

On September 11, 2024, Mr. Kaplan was arrested at his parents' home pursuant to an

arrest warrant issued by the Court based on the government's motion to remand him for

allegedly committing crimes on release and for allegedly violating other of his bail conditions,

including contacting witnesses and alleged victims and engaging in "employment pertaining to

investment advisement."  (ECF Nos. 106, 109).  Based on the government's submission,

including a 55-page affidavit signed by Special Agent John M. Iannuzzi of the FBI (the

"Iannuzzi Affidavit") (ECF No. 105), the Court entered an order of detention on the government's motion for revocation of Mr. Kaplan's pretrial release under 18 U.S.C. § 3148(b)(1).  (ECF Nos. 104, 109, 110).  During the initial appearance on this motion, the Court observed that the Iannuzzi Affidavit presented evidence of crimes and other bail violations that "well surpasses clear and convincing evidence."  Sept. 11, 2024 Tr. at 2-4.  The Court ruled that Mr. Kaplan would be remanded pending the outcome of any detention hearing, and scheduled the detention hearing for September 25, 2024.  *Id.* at 8:23-9:7.

On September 23, 2024, defense counsel submitted a motion, on consent of the government, to adjourn the detention hearing indefinitely to review the government's document production and to conduct its own defense investigation.  (ECF No. 117).  During the conference held on October 9, 2024, the government advised the Court that it would be seeking a superseding indictment within approximately the next 30 to 45 days.  *See* Oct. 9, 2024 Tr. at 3:4-10.  We understand that the superseding indictment will include new charges against Adam Kaplan based on the allegations in the Iannuzzi Affidavit.

## ARGUMENT

### I.  Legal Standard.

#### A.  The law strongly favors pretrial release for a defendant charged with non-violent offenses.

The Bail Reform Act of 1984 *requires* pretrial release on a personal recognizance bond "unless the [Court] determines that such release will not reasonably assure the appearance of the person as required or will endanger the safety of any other person or the community."  18 U.S.C. 3142(b).  Thus, "it is only a limited group of offenders who should be denied bail pending trial." *United States v. Shakur*, 817 F.2d 189, 195 (2d Cir. 1987); *accord United States v. Salerno*, 481 U.S. 739, 747 (1987) ("The Bail Reform Act carefully limits the circumstances under which

detention may be sought to the most serious of crimes.").  Courts must "order the pretrial release

of the person . . . subject to the least restrictive condition, or combination of conditions, that such

judicial officer determines will reasonably assure the appearance of the person as required and

the safety of any other person and the community."  18 U.S.C. § 3142(c)(2).  Accordingly,

"[w]henever a court can fashion the conditions of an applicant's release in such a manner that the

danger may be averted, it *must do so* and grant the motion for release . . . [T]he Court *must only

deny bail as a matter of last resort*."  *United States v. Hunter*, 2020 WL 2537579, at * 2 (D.N.J.

May 19, 2020) (emphasis added).

### B. Bail may be revoked only if the Court finds there are no set of conditions that will reasonably assure the defendant's appearance or the safety of the community, or if it finds that the defendant is unlikely to abide by any conditions of release.

A defendant who violates a condition of pretrial release is subject to a revocation of

release, an order of detention, and a prosecution for contempt of court.  *See* 18 U.S.C. § 3148(a).

If the government initiates a revocation proceeding, the court, following a detention hearing,

must revoke bail and order detention only if *both* of the following conditions are satisfied:

(1) the Court finds that there is (a) probable cause to believe that the defendant
committed a federal, state, or local crime while on release, *or* (b) clear and
convincing evidence that the defendant has violated any other condition of
release; ***and***

(2) the Court finds that (a) based on the factors set forth in 18 U.S.C. § 3142(g),[21]
there is no condition or combination of conditions of release that will assure the
defendant will not flee or pose a danger to any other person or the community,
or (b) the defendant is unlikely to abide by any condition or combination of
conditions of release."  18 U.S.C. § 3148(b).

---

[21] The factors set forth in 18 U.S.C. § 3142(g) are: (1) the nature and circumstances of the
offense charged, including whether the offense is a crime of violence; (2) the weight of the
evidence against the defendant; (3) the history and characteristics of the defendant; and (4) the
nature and seriousness of danger to any person in the community posed by the defendant's
release."

A probable cause finding that the defendant committed a felony on release raises a rebuttable presumption that no set of conditions will assure that the defendant will not pose a danger to others.  *See* 18 U.S.C. § 3148(b)(2)(B).  To rebut the presumption, a defendant need only introduce "some evidence contrary to the presumed fact."  *United States v. Rodriguez*, 950 F.2d 85, 88 (2d Cir. 1991).  *See also United States v. Mercedes,* 254 F.3d 433, 436 (2d Cir. 2001) (In order to rebut the presumption, the defendant "bears a limited burden of production . . . by coming forward with evidence that he does not pose a danger to the community.").  At all times, however, "the government retains the ultimate burden of persuasion by clear and convincing evidence that the defendant presents a danger to the community."  *Mercedes*, 254 F.3d at 436. *See also United States v. Sabhnani*, 529 F.Supp.2d 377, 383 (E.D.N.Y. 2007) (Because pre-trial release is "generally favor[ed]" over detention, the Government holds the ultimate burden of persuasion.).

## II.  The Proposed Release Conditions Reasonably Assure The Safety Of The community.[22]

### A.  The factors under Section 3142(g) do not support a finding that Mr. Kaplan poses an unmitigated risk of dangerousness.

The analysis under Section 3142(g) strongly favors pretrial release at this stage.  To begin with, the nature and circumstances of the alleged wrongdoing in the Iannuzzi Affidavit are not

---

[22] As discussed in the Preliminary Statement above, for the limited purposes of this application, Mr. Kaplan does not challenge any finding by the Court based on the Iannuzzi Affidavit that probable cause exists to believe he committed a felony while on release or that clear and convincing evidence establishes that he violated any other condition of his bond.  As an initial matter, the forthcoming superseding indictment will likely include charges based on the allegations in the Iannuzzi Affidavit.  Accordingly, Mr. Kaplan will seek to defend against those charges at trial without previewing his defenses in advance.  Furthermore, the defense is still conducting its own investigation of the allegations.  *See, e.g., United States v. Dreier*, 596 F.Supp.2d 831, 832 (S.D.N.Y. 2009) (ordering pretrial release on conditions despite that "for the limited purpose of the bail hearing, the defendant does not challenge the allegations of the indictment that set forth in some detail Dreier's sophisticated frauds and his procurement of impersonation by his confederates."); *United States v. Himler*, 797 F.2d 156, 159 (3d Cir. 1986)

violent. *See* 18 U.S.C. § 3142(g)(1). Furthermore, Mr. Kaplan is not violent and has no history of participating in any violence. *See* 18 U.S.C. § 3142(g)(2). In his letter to the Court, ██████ ██████, ████████████████████ ███████████████████████████ ██████████████████████, observes that "Adam . . . is a weak person. Most of the time he don't feel good. Adam drinks a lot of water, and every time I offering him to work out with me, he is complaining that he don't feel good, so he can't."[23] According to ██ ████████, "when MDC has extraordinary conditions like extra lockdowns and strip searches, it is extremely dangerous for Adam, because no air, no water, he start to panic, his face became red and he's breathing heavy that I tried to calm."[24]

The weight of the evidence against Mr. Kaplan is the least important factor because Mr. Kaplan must be presumed innocent at this stage of the proceedings. *United States v. Dabidah*, 2024 WL 4627639, *2 (S.D.N.Y. Oct. 30, 2024); 18 U.S.C.§ 3142(j). "The United States Constitution places strict limits on the government's ability to imprison those who have been accused of crimes. A person charged with a crime is presumed innocent." *United States. v. Scarpa*, 815 F.Supp. 88, 91 (E.D.N.Y. 1993) (citations omitted). "Unless [the] right to bail before trial is preserved, the presumption of innocence, secured only after centuries of struggle, would lose its meaning." *Id.*

---

(holding that court erred in detaining defendant based on dangerousness without setting conditions of release, notwithstanding that "[t]he defendant does not contest the district court's findings of fact," since he argued "that the established facts do not, under the statute, support a finding that there are no release conditions which would assure the safety of the community.").

[23] *See* Letter of ████████, dated Nov. 10, 2024 (Creizman Decl. Ex. 8). The letter is quoted as written.

[24] Id.

**B.  Detention for obstruction of justice is unwarranted here.**

A court may detain a defendant prior to trial if there is "a serious risk that such person will obstruct or attempt to obstruct justice, or threaten, injure, or intimidate, or attempt to threaten, injure, or intimidate, a prospective witness or juror."  18 U.S.C. § 3142(f)(2)(B).  A court, however, must first determine that the defendant presents a serious risk of obstruction in the future, and then, whether any conditions or combination of conditions will reasonably assuage that risk.  *See United States v. Campos*, 2019 WL 7049953, *1 (E.D.N.Y. Dec. 23, 2023).  Even accepting the allegations of the Iannuzzi Affidavit at face value, the government cannot establish here, as it must, "that there is a serious risk . . . [of obstructive conduct] . . . going forward."  *United States v. Madoff*, 586 F.Supp.2d 240, 250 (S.D.N.Y. 2009).

To begin with, Mr. Kaplan has now spent over two horrific months incarcerated in MDC Brooklyn, with over 85% of his time confined to his cell.  Because he would never wish to return to the inhumane conditions at MDC Brooklyn, any chance that he might seek to engage in witness intimidation or tampering has been reduced to zero.  In any event, as set forth below, the Proposed Release Conditions are more than sufficient to prevent Mr. Kaplan from engaging in any obstructive conduct.

In these circumstances, there is no "serious risk" that if released prior to trial, Mr. Kaplan will engage in obstructive conduct.

**C.  Any risk of obstructive conduct is reasonably mitigated by the Proposed Release Conditions.**

Even assuming some risk of obstructive conduct still exists, the Proposed Release Conditions are tailored to address precisely any concerns the Court may have regarding dangerousness or obstruction of justice.  Mr. Kaplan will be on strict home detention with electronic monitoring.  All visits with only limited exceptions as set forth above will require

advance approval by Pretrial Services.  And Pretrial Services will be able to confirm that Mr.

Kaplan is complying with those restrictions by having the ability to monitor a live feed and

recordings from the camera facing the front door of the Manhattan Apartment that will be

installed if Mr. Kaplan is released.

Furthermore, Mr. Kaplan will be permitted only a single cellular telephone that will be

subject to monitoring by Pretrial Services.  Moreover, the Proposed Release Conditions include

the right of Pretrial Services to randomly visit and inspect the Manhattan apartment.

Accordingly, Mr. Kaplan will be effectively precluded from communicating with any alleged

victims or potential witnesses without detection.  *See United States v. Mercado*, 2024 WL

3082704 (W.D.N.Y. June 20, 2024) (finding that conditions that "severely limit" the defendant's

ability to engage in other crimes or acts of obstruction without the government's knowledge were

sufficient to reasonably assure defendant was not a danger to the community).  The Proposed

Release Conditions thus prevent Mr. Kaplan from threatening, intimidating, or otherwise

tampering with any witnesses, directly or indirectly.

In these circumstances, the Proposed Release Conditions are more than sufficient to

reasonably assure the Court that Mr. Kaplan presents no danger to the community or any serious

risk of obstructing justice.  *See, e.g., United States v. Esposito*, 309 F.Supp.3d 24, 31 (S.D.N.Y.

2018) (ordering defendant's pretrial release subject to strict conditions where the "danger

Esposito poses to the community can be reasonably mitigated by conditions of release,"

notwithstanding the court's finding that "there is sufficient evidence that Esposito has significant

involvement and influence in violent activities."); *Dreier*, 596 F.Supp.2d at 833-835 (releasing

defendant on stringent conditions, including strict home confinement, despite finding that the

defendant, "if released without conditions, would pose a genuine risk [to the community].");

*Campos*, 2019 WL 7049953, at *1-*2 (releasing defendant, an alleged organized crime figure charged with racketeering, extortionate credit collection, and obstruction of justice, among other things, on conditions similar to the Proposed Release Conditions because they were "sufficient to reasonably mitigate th[e] risk" of similar conduct.); *United States v. Danilovich*, 1:12-CR-171-JPO (S.D.N.Y), ECF No. 1628 at 98:23-100:5 (declining to detain defendant prior to trial, despite finding probable cause that defendant committed crimes while on pretrial release, including operating a bookmaking business, money laundering, and obstruction of justice, where home detention with electronic monitoring were sufficient to reasonably assure the safety of the community and his appearance in court).

## III. The Proposed Release Conditions Reasonably Assure Mr. Kaplan's Appearance.

### A. Mr. Kaplan is not a flight risk.

The government does not seriously argue that Mr. Kaplan presents a flight risk because he plainly does not.  To the contrary, Mr. Kaplan has strong community and family ties in this District.  He was born and raised here.  His family members are all here.  ████████████ ████████████████████████  And the fact is that Mr. Kaplan has nowhere else to go.  Furthermore, Mr. Kaplan was aware of the SEC's investigation and the government's parallel criminal investigation as far back as five years ago.  Mr. Kaplan did not attempt to flee then, or after the SEC brought its enforcement action in March 2023, or even after he was indicted in July 2023.

To the contrary, Mr. Kaplan has a perfect track record of appearing in court as required. After the SEC filed its enforcement action, Mr. Kaplan, who then resided in Miami Beach, frequently traveled and spent time in New York so that he could assist in his defense.  In addition, on the morning of July 25, 2023, the FBI agents visited the Kaplans' family home in Great Neck to arrest Mr. Kaplan, but he was not there.  Upon learning of the attempted arrest,

Mr. Kaplan promptly self-surrendered to the FBI. There is no dispute that he has appeared as required at every court conference and has scrupulously reported to Pretrial Services as directed and provided monthly paperwork to Pretrial Services in timely fashion. For the last five years, Mr. Kaplan has relentlessly maintained his innocence and has actively participated in his defense. By any observable measure, Mr. Kaplan is steadfast in seeing this case through to its conclusion.

The government nevertheless suggests that Mr. Kaplan is a flight risk based solely on the uncorroborated assertion by CC-1 that Mr. Kaplan asked CC-1 "what it was like to live in Costa Rica and how CC-1 made money in Costa Rica." Iannuzzi Affidavit ¶ 134. According to CC-1, and only CC-1, prior to that conversation Mr. Kaplan told CC-1 that he "will need to travel 'south' and then 'even further south.'" Mr. Kaplan denies having made these statements, and CC-1 cannot be trusted. CC-1 has a criminal history of committing financial fraud going back over 40 years. He is a serial fraudster.

Notably, during its investigation of the allegations in the Iannuzzi Affidavit, defense counsel obtained public archived records from various federal and state courts that reveal, among other things, that since the 1980s, CC-1 has been convicted of masterminding flower-selling schemes in Texas, Missouri, and Florida that are virtually identical to the scheme he admits he masterminded and perpetrated here.[25]

## B. Any risk of flight is reasonably mitigated by the Proposed Release Conditions.

Although the Proposed Release Conditions are not necessary to assure Mr. Kaplan's appearance in court—since he has and will continue to appear for every required court

---

[25] Defense counsel obtained archived files from the various courts in which CC-1 was charged and convicted. A copy of his PSR from a 1993 criminal case in the Northern District of Texas reveals that CC-1 is serial fraudster. *See* Creizman Decl. Ex. 9 ¶¶ 1-10, 12, 27, 28.

conference—the proposed conditions of strict home detention and electronic monitoring make it effectively impossible for Mr. Kaplan to flee.

## IV. Mr. Kaplan will abide by the conditions of release.

Mr. Kaplan will unquestionably abide by the Proposed Release Conditions. *See* 18 U.S.C. § 3148(b)(2). To begin with, he has been incarcerated at MDC Brooklyn for 69 days now, and, because of frequent, and sometimes weeks' long lockdowns, has been confined to his cell—now infested with rodents—for over 85% of his time on remand. "That time itself is a severe sanction and a cautionary experience." *United States v. Desmond*, 2023 WL 4052415, at *4 (W.D. Wash. June 16, 2023) (Affirming district court's order releasing defendant after detention hearing despite finding that defendant had committed crimes and violated other conditions of release because amended conditions of release would mitigate against risk of flight and danger to the community). As discussed earlier in this memorandum, Mr. Kaplan has experienced the abhorrent living conditions at the MDC first-hand ███████████████ ███████████████████████████ other inmates. If released, he will not do anything that might subject him to being remanded again. In any event, the Proposed Release Conditions are sufficiently stringent to prevent Mr. Kaplan from violating his release conditions and provide substantial transparency to Pretrial Services such that any violations will be readily detected.

## V. Compelling reasons warrant Mr. Kaplan's release pending trial.

Event absent a finding that any set of conditions can reasonably assure a defendant's appearance or the safety of the community, the Bail Reform Act authorizes the temporary release of a defendant to the extent such release is necessary for the preparation of the defense or "for another compelling reason." 18 U.S.C. 3142(i)(4).

**A.  The deplorable conditions at MDC Brooklyn and Mr. Kaplan's chronic medical conditions are circumstances that independently, and in combination, constitute "compelling reasons" warranting release on the Proposed Release Conditions.**

**1.        The harsh realities of incarceration at MDC Brooklyn.**

The Court undoubtedly is well aware of the burgeoning case law in this District and in the Southern District of New York that have considered MDC Brooklyn's barbaric living conditions, high incidence of gang violence, and substandard medical care as a substantial factor in ordering pretrial and presentencing release, fashioning an appropriate sentence, and granting compassionate release.  *See, e.g., United States v. Chavez*, 710 F.Supp.3d 227 (S.D.N.Y. 2024) (continuing release pending Bureau of Prisons' designation of institution for service of sentence on the ground that "the conditions in the MDC qualify as 'exceptional reasons' justifying Chavez's continuing release); *United States v. Colucci*, --F.Supp.3d--, 2024 WL 3643857 (E.D.N.Y. Aug. 5, 2024) (imposing sentence of nine months' imprisonment with caveat that if the Bureau of Prisons designates MDC as the institution for defendant to serve his sentence, defendant would serve nine months of home detention instead).[26]

Although *Chavez* was decided over eleven months ago, and *Colucci* over three months ago, based on Mr. Kaplan's experience and confirmed by media reports,[27] the conditions at

---

[26] *See also, e.g.*, *United States v. Griffin*, 2024 WL 2891686, *3 (E.D.N.Y. Jun. 10, 2024) (granting compassionate release where defendant inmate was seriously injured in a violent attack and required follow up medical care; "[I]t has been well documented that the MDC has an ongoing issue with frequent lockdowns due to violence and the threat of violence, among other concerns, which has delayed medical care for a number of inmates."); John Annese, *Brooklyn judge calls Sunset Park federal jail an 'abomination; after staff ignore order to send ailing inmate to medical facility*, Dec. 20, 2023, N.Y. DAILY NEWS, *available at* https://www.nydailynews.com/2023/12/20/brooklyn-judge-calls-sunset-park-federal-jail-an-abomination-after-staff-ignore-order-to-send-ailing-inmate-to-medical-facility/

[27] *See, e.g.*, Michael R. Sisak and Michael Balsamo, *Inside the Brooklyn federal jail where Sean 'Diddy' Combs is locked up: Violence, squalor and death*, ASSOCIATED PRESS, Sept. 19, 2024, *available at* https://apnews.com/article/sean-combs-diddy-federal-prisons-jails-mdc-brooklyn-8c910839adf3ac54a8adc8d7cb3f0b79; Rich Schapiro, *Sean Combs' new home—a notorious*

MDC Brooklyn remain unchanged. In *Chavez*, Judge Furman discussed, among other things, the "near-perpetual" lockdowns that prohibit inmates "from leaving [their cells] for visits, calls, showers, classes, or exercise," which are "tantamount to solitary or near solitary confinement, a practice that is increasingly viewed as inhumane." *Chavez* 710 F.Supp.3d at 233. MDC Brooklyn is also "notoriously and, in some cases, egregiously slow in providing necessary medical and mental health treatment to inmates." *Id.* at 234. In addition, the documented substandard living conditions at MDC Brooklyn include "visible mold on walls and ceilings, contaminated drinking water, vermin infestation, mouse droppings falling through HVAC vents, and roaches and flies in shower," broken lights, and broken emergency call buttons. *Id.* at 235.

In *Colucci*, Judge Brown discussed the "chaotic, unremedied lawlessness at the facility," including the use of smuggled cell phones, narcotics, and cigarettes, observing that "[t]he results of such anarchy are predictable." *Colucci,* 2024 WL 3643857, at *4. Indeed, "[e]ach of the five months preceding this opinion was marred by instances of catastrophic violence at MDC, including two apparent homicides, two gruesome stabbings and an assault so severe that it resulted in a fractured eye socket for the victim. One knife attack was captured on a surveillance video producing images that are horrifying beyond words." *Id.* at *5.[28] As Judge Brown

---

*federal jail—has a 'way of breaking people,' lawyers say*, NBC NEWS, Sept. 18, 2024, *available at* https://www.nbcnews.com/investigations/sean-combs-new-home-notorious-federal-jail-way-breaking-people-lawyers-rcna171638; Michael Stallone and Kelly Hayes, *Inside the Brooklyn federal jail where Diddy is locked up: 'Hell on earth'*, FOX 5 NEW YORK, Sept. 19, 2024, *available at* https://www.fox5ny.com/news/nyc-diddy-federal-jail-brooklyn-arrest-charges; Lola Fadulu, *Inmate Dies After Fight Breaks Out at Troubled Brooklyn Jail*, N.Y. TIMES, July 17, 2024, *available at* https://www.nytimes.com/2024/07/17/nyregion/inmate-dies-metropolitan-detention-center.html.

[28] Judge Brown noted that the attack occurred in an "open area unimpeded by any supervision, the response to the event took an unconscionably long time, and the victim, suffering from 44 knife wounds, was left unaided while a few outnumbered corrections officers eventually attempted to pursue the attackers." *Id.*

observed, "[t]he activities precipitating these attacks are nearly as unthinkable and terrifying as the ensuing injuries: drug debt collection, fights over illegal narcotics, resisting an organized gang robbery, internecine gang disputes and as-yet unidentified 'brawls.'" *Id.*[29]

██████████████████████████████████████████

███████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████████████████

██████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████

███████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████████████████

████████████████████████████████████████████████████

---

[29] Following Judge Brown's ruling in *Colucci*, the Bureau of Prisons announced that "has temporarily paused all initial designations to the minimum security cadre component of MDC Brooklyn." *See, e.g.,* Robert Abruzzi, *Brooklyn's MDC jail stops accepting sentenced inmates amid concerns over 'barbaric conditions*, Brooklyn Daily Eagle. Sept. 17, 2024, *available at* https://brooklyneagle.com/articles/2024/09/17/brooklyn-mdc-stops-accepting-inmates-amid-barbaric-conditions/

[30] *See* Creizman Decl. Ex. 3 at 2.



The fact is that the Bureau of Prisons in general, and MDC Brooklyn, in particular, have an abysmal record in adequately monitoring and treating chronic conditions due to understaffing and overcrowding.[32]  As Judge Furman observed, "the MDC is notoriously and, in some instances, egregiously slow in providing necessary medical and mental health treatment to inmates. . . .  It has become common for defense counsel to require court intervention to ensure that inmates receive basic care — and, even more shocking, not uncommon for court orders to go

---

[31] *See* Creizman Decl. Ex. 4 at 1; *see also, e.g.,* Jacqueline Howard, *Asthma can turn deadly in rare cases. Here's How*, CNN HEALTH, Nov. 11, 2019,  *available at* https://www.cnn.com/2019/11/11/health/asthma-deaths-explainer/index.html.

[32] *See, e.g.,* U.S. Dep't of Justice, OIG Report, *Review of the Federal Bureau of Prisons' Medical Staffing Challenges*, Mar. 2016, *available at* https://oig.justice.gov/reports/2016/e1602.pdf; Walter Pavlo, *Federal Bureau of Prisons' Medical Care Falls Short of its Own Policy*, FORBES, Apr. 19, 2022, *available at* https://www.forbes.com/sites/walterpavlo/2022/04/19/federal-bureau-of-prisons-medical-care-falls-short-of-its-own-policy/.

unheeded." *Chavez* 710 F.Supp.3d at 234.  Indeed, earlier this year, the Daily News reported that "Staff at Brooklyn's troubled Metropolitan Detention Center ignored an inmate's cancer diagnosis for months, letting a mass in his lungs grow to double its size while he coughed up enough blood to fill a milk carton, defense lawyers say."[33] █████████████████████████

████████████████████████████████████████████████

████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████

██████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████████

████████████████████████████████████████████

---

[33] John Annese, *Brooklyn federal jail ignores inmate's lung cancer diagnosis in latest medical mess,* , Jul. 9, 2024, *available at* https://www.rv-times.com/nation_world/brooklyn-federal-jail-ignores-inmate-s-lung-cancer-diagnosis-in-latest-medical-mess/article_3f177508-1f82-5bae-9f5b-17017cb98bc3.html; *see also* John Annese, *Judge demands answers from Brooklyn federal jail officials over inmate's medical woes*, May 6, 2024, *available at* https://www.nydailynews.com/2024/05/06/judge-demands-answers-from-brooklyn-federal-jail-officials-over-inmates-medical-woes/.

███████████████████████████████████████████████

███████████████████████████████████████████

The lack of adequate staffing, the lengthy wait for examinations, and the remarkably unsanitary living conditions do not portend positive health outcomes for Mr. Kaplan.  In these circumstances, compelling reasons warrant Mr. Kaplan's temporary release pending trial on the Proposed Release Conditions.  *See e.g., Chavez*, 710 F.Supp.3d at 238 ("Indeed, many district courts have found that conditions in prisons, in combination with the personal circumstances of individual defendants, can constitute exceptional circumstances.") (quotations and citations omitted).

## B. Temporary release pending trial is warranted so that Mr. Kaplan can meaningfully participate and assist counsel in his defense.

Mr. Kaplan's detention significantly hinders his preparation for trial.  The "inability of a defendant adequately to prepare his case skews the fairness of the entire system." *Barker v. Wingo*, 407 U.S. 514, 532 (1972).  In *United States v. Bodmer*, 2004 WL 169790, (S.D.N.Y. Jan. 28, 2004), Judge Scheindlin granted pretrial release of a defendant charged with multiple white-collar crimes, finding the defendant faced "serious criminal charges" and pretrial detention would "hinder his ability to gather evidence, contact witnesses, or otherwise prepare for his defense." *Id.* at *3 (citing *Barker*, 407 U.S. at 533).  The court noted that because of the nature of

---

[34] The rodent infestation in Mr. Kaplan's cell, and in the larger unit, is concerning.  In his letter to the Court, dated November 10, ████████████████, ██████████████████████████████, describes in detail the recent rodent infestation in Mr. Kaplan's cell.  *See* Creizman Decl. Ex. 10.  ███████████ reports that the infestation in Mr. Kaplan's cell "clearly made Adam very nervous and extra anxious.  He lost multiple nights of sleep in fear of the infestation in addition to appearing sick from it." *Id.*  According to ███ ███████, upon inspecting Mr. Kaplan's cell—which he noted is kept "fastidiously clean,"— "[t]he mice were seen initially between the lockers, then within the lockers and throughout the cell.  While I was assisting to locate the entry points of the mice, I found mouse droppings which smelled like raw sewage." *Id.*

the charges, the government expected discovery to be voluminous and it would be far easier for the defendant to assist his counsel in reviewing and responding to discovery if counsel has regular, uninterrupted access to the defendant.  Additionally, the court reasoned that the defendant "will undoubtedly be crucial to his lawyers' understanding of the complicated financial transactions that are the subject of the indictment.  *See also United States v. Stein*, 2005 WL 3071272 (S.D.N.Y. Nov. 15, 2005) (acknowledging that the argument that close participation with counsel in the preparation of a white-collar crime with complex nature of the charges and the evidence has merit).  Indeed "[i]mposing those consequences on anyone who has not yet been convicted is serious."  *Bodmer*, 2004 WL 169790 (citing *Barker*, 407 U.S. at 533).

Here, like in *Bodmer*, Mr. Kaplan is accused of serious white-collar crimes and close participation with counsel in preparation for trial is critical to his defense.  In its Order dated October 11, 2024, the Court designated this case as complex, noting that: (1) there allegedly are over fifty victims, and for each victim, "the Government necessarily must gather and produce separate evidence to Defendants—including communications with said victim. . . [and] voluminous banking and financial data. . . .";  (2) the alleged criminal conduct in the Iannuzzi Affidavit, along with "the prospect of additional obstruction . . . is likely to result in a superseding indictment that would further expand and complicate this already sprawling case." ECF No. 122 at 4-5.

The conditions at the MDC are too restrictive to permit the type of collaboration that is needed to adequately prepare for trial in this case.  For example, while planned lockdowns generally allow for continued legal visits, emergency lockdowns prevent counsel from meeting or speaking with their client.  On the day following Mr. Kaplan's remand to the MDC, counsel was denied entry three separate times due to an emergency lockdown.  Counsel has also been

separately advised by MDC staff that lockdowns will become more frequent as the holidays approach due to understaffing.  Furthermore, during in-person legal visits, it often takes MDC staff nearly an hour to produce Mr. Kaplan for a legal meeting, eating into much of the allotted meeting time.  On one occasion, Mr. Kaplan was not even informed that his counsel had arrived and, as a result, he did not meet with counsel before legal visiting hours ended.  In addition, the visiting area is sometimes so crowded that there are no attorney visiting rooms available, requiring counsel to meet with Mr. Kaplan alongside other inmates and their social or attorney visitors, which permits little privacy.  Furthermore, one of the members of the defense team had to terminate a meeting with Mr. Kaplan early because he needed to use the restroom and the restroom in the visiting area had no running water.

Legal calls and videoconferences are often unilaterally cancelled, moved up in time, or shortened by MDC staff, with little or no notice.  Meaningful review of discovery and engaging in other tasks relevant to the case are sometimes interrupted by the sounds of inmates and corrections officers speaking loudly or yelling at each other.  On one occasion, a legal call between Mr. Kaplan and his counsel ended abruptly when a brawl erupted outside of the call room which resulted in an emergency lockdown.  Another legal call was similarly cut short when an inmate near the call room was screaming at the top of his lungs, threatening violence towards other inmates in the unit.

Further complicating trial preparation is that under the confidentiality order, Mr. Kaplan cannot review a significant subset of the discovery unless in the presence of counsel.  And for those discovery materials which Mr. Kaplan can review on his own, he has trouble focusing on the tasks at hand because of the noise in his overcrowded unit and in the visiting room, ████
████████████.  Adding to Mr. Kaplan's difficulties in preparing his defense

without counsel present include the frequent and lengthy lockdowns, the rodent infestation in his cell, the lack of privacy in his unit, and random violence breaking out among inmates.

In these circumstances, the need for Mr. Kaplan to meaningfully participate and assist counsel in preparing his defense warrant temporary release pending trial on the Proposed Release Conditions.

## CONCLUSION

For all of the foregoing reasons, the Proposed Release Conditions are sufficient to reasonably assure Mr. Kaplan's appearance and the safety of the community.  In the alternative, compelling reasons warrant Mr. Kaplan's temporary pretrial release on the Proposed Release Conditions.

Dated:  New York, New York
          November 18, 2024

/s/ Eric M. Creizman
Eric M. Creizman (EC7684)
Christina O. Gotsis (CG0170)
MORRISON COHEN LLP
909 Third Avenue, Fl 27
New York, New York 10022
Tel.: (212) 735-8640
Email: ecreizman@morrisoncohen.com
          cgotsis@morrisoncohen.com